

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-29-2007

# SUPERVALU Inc v. Bd Trustees SW PA

Precedential or Non-Precedential: Precedential

Docket No. 06-3829

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"SUPERVALU Inc v. Bd Trustees SW PA" (2007). *2007 Decisions.* Paper 481.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/481

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-3829

———

SUPERVALU, INC.

v.

BOARD OF TRUSTEES OF THE SOUTHWESTERN
PENNSYLVANIA AND WESTERN MARYLAND AREA
TEAMSTERS AND EMPLOYERS PENSION FUND,
a/k/a THE TRUSTEES OF THE SOUTHWESTERN
PENNSYLVANIA AND WESTERN MARYLAND AREA
TEAMSTERS AND EMPLOYERS PENSION FUND
a/k/a SOUTHWESTERN PENNSYLVANIA
AND WESTERN MARYLAND AREA TEAMSTERS
AND EMPLOYERS PENSION FUND


BOARD OF TRUSTEES OF THE SOUTHWESTERN
PENNSYLVANIA AND WESTERN MARYLAND AREA
TEAMSTERS AND EMPLOYERS PENSION FUND,
a/k/a THE TRUSTEES OF THE SOUTHWESTERN
PENNSYLVANIA AND WESTERN MARYLAND AREA
TEAMSTERS AND EMPLOYERS PENSION FUND,

Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 05-cv-00737)
District Judge: Honorable Joy F. Conti

Argued May 17, 2007
Before: FISHER and ROTH, *Circuit Judges*,
and RAMBO,* *District Judge*.

(Filed: August 29, 2007)

Vince P. Szeligo (Argued)
Brendan Delaney
Wick, Streiff, Meyer, O'Boyle & Szeligo
1450 Two Chatham Center
Pittsburgh, PA 15219-3427
        *Attorneys for Appellant*

Thomas M. Christina (Argued)
Ogletree, Deakins, Nash, Smoak & Stewart
300 North Main Street
The Ogletree Building
P.O. Box 2757

_____

*The Honorable Sylvia H. Rambo, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

Greenville, SC 29602
     *Attorneys for Appellee*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

The Board of Trustees of the Southwestern Pennsylvania and Western Maryland Area Teamsters and Employers Pension Fund (the "Fund") appeals the District Court's grant of summary judgment in favor of SUPERVALU, Inc. ("SUPERVALU"). The Fund claims that the District Court improperly concluded that SUPERVALU did not violate § 4212(c) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1392(c). We agree. For the reasons that follow, we will reverse the District Court's judgment and remand the case to the District Court for enforcement of the Arbitrator's Award.

I.

The Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq.*, amended ERISA. The MPPAA was enacted "out of a concern that ERISA did not adequately protect multiemployer pension plans from the adverse consequences that result when individual employers terminate their participation or withdraw." *Warner-Lambert Co. v. United Retail & Wholesale Employee's Teamster Local No. 115 Pension Plan*, 791 F.2d 283, 284 (3d Cir. 1986) (internal citation

3

omitted). "The . . . amendments to ERISA were designed to prevent employers from withdrawing from a multiemployer pension plan without paying their share of unfunded, vested benefit liability, thereby threatening the solvency of such plans." *Mfrs. Indus. Relations Ass'n v. E. Akron Casting Co.*, 58 F.3d 204, 205-06 (6th Cir. 1995) (citing *Mason & Dixon Tank-Lines, Inc. v. Cent. States Pension Fund*, 852 F.2d 156, 158-59 (6th Cir. 1988)). At the time the MPPAA was enacted many employers were withdrawing from multiemployer plans because they could avoid withdrawal liability if the plan survived for five years after the date of their withdrawal. *Debreceni v. Outlet Co.*, 784 F.2d 13, 15-16 (1st Cir. 1986).

Congress recognized that multiemployer pension plans affected millions of Americans and found that "withdrawals of contributing employers from a multiemployer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, its participants and beneficiaries, and labor-management relations." 29 U.S.C. § 1001a(a). It intended for the MPPAA to uniformly impose withdrawal liability and to "'relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers.'" *Debreceni*, 784 F.2d at 16 (quoting H.R. Rep. 869, 96th Cong., 2d Sess., 67, *reprinted in* 1980 U.S. Code Cong. & Ad.News 2918, 2935). To solve this problem, the MPPAA requires that a withdrawing employer pay its share of the plan's unfunded liability. *See Warner-Lambert*, 791 F.2d at 284. This insures that the financial burden will not be shifted to the remaining employers. *See Cent. States, Se. &*

4

*Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371 (7th Cir. 1992).

Section 4201 provides that a withdrawing employer is liable for its share of the plan's unfunded vested benefits. 29 U.S.C. § 1381(a).[1] It is the duty of the pension plan to determine whether withdrawal liability has occurred and in what amount. 29 U.S.C. §§ 1382, 1391. Section 4211 provides that the amount of an employer's withdrawal liability is the employer's proportionate share of the unfunded vested benefits existing at the end of the plan year preceding the plan year in which the employer withdraws. 29 U.S.C. § 1391(b)(2)(A). A "complete withdrawal," as in this case, occurs when an employer "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a). "[T]he date of complete withdrawal is the date of the cessation of the obligation to contribute or the cessation of covered operations." 29 U.S.C. § 1383(e). The "obligation to contribute" arises "(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a). Although "all covered operations" is not defined in the statute, we have held that it means the "substantial cessation of normal business activity." *Crown Cork & Seal Co.,*

---

[1]Although statutory provisions exist that exempt withdrawing employers from incurring withdrawal liability in various situations, none of the exemptions are applicable to this case. *See*, *e.g.*, 29 U.S.C. § 1384.

5

*Inc. v. Cent. States Se. & Sw. Area Pension Fund*, 982 F.2d 857, 865-66 (3d Cir. 1992).

SUPERVALU, a wholesale food distributor, was a contributing employer to the Fund, which is a defined benefit multiemployer pension plan governed by ERISA, as amended by the MPPAA. Employers agree to contribute to the Fund based on collective bargaining agreements ("CBAs") with various local Teamsters unions. The Fund, in turn, provides retirement benefits for the employees of the participating employers. SUPERVALU and the Teamsters Local 872 (the "Union") had CBAs which required SUPERVALU to contribute to the Fund on behalf of employees at SUPERVALU's Belle Vernon, Pennsylvania facility through January 31, 2003, or the cessation of covered work.

At the beginning of 2002, SUPERVALU decided to close the Belle Vernon facility for business reasons. On March 14, 2002, SUPERVALU informed its employees of the decision, and that the closure would occur by late summer 2002. As a result of the closure, approximately three-hundred employees would lose their jobs. SUPERVALU and the Union engaged in negotiations from March until May 2002 regarding the effects of the closing.

The negotiations included discussions regarding SUPERVALU's potential withdrawal liability to the Fund. If SUPERVALU withdrew prior to June 30, 2002, the end of the Fund's 2001-2002 plan year, it would incur no withdrawal liability because the Fund did not have any unfunded vested benefits at the end of the prior plan year (2000-2001). *See* 29 U.S.C. § 1391(b)(2)(A). However, if withdrawal occurred after

6

June 30, 2002, during the 2002-2003 plan year, SUPERVALU would incur significant withdrawal liability based on the unfunded vested benefits that would exist at the end of the 2001-2002 plan year. *See id.*

It is clear from the record that SUPERVALU was aware of its potential liability under both scenarios. First, at SUPERVALU's request, the Fund informed it of the status of the Fund's assets as of April 2002: there was a negative return on the assets during the first three-quarters of the 2001-2002 plan year. Additionally, SUPERVALU informed the Union of the potential withdrawal liability if it were to withdraw in the 2002-2003 plan year. At a bargaining meeting, a SUPERVALU representative stated that terminating the CBAs after June 30, 2002, would place SUPERVALU in another plan year and make it liable for a large unfunded liability. SUPERVALU also explained to the Union that its members would not benefit from SUPERVALU's continued participation in the Fund, and that SUPERVALU would rather the money go directly to its employees.

Based on this knowledge and its desire to maximize its employees' benefits, SUPERVALU proposed that the CBAs, which were set to expire on January 31, 2003, be terminated and replaced prior to June 30, 2002. It informed the Union that the early termination would prevent SUPERVALU from being assessed withdrawal liability for the 2002-2003 plan year, which was estimated at the time to be in the range of $1 to $1.5 million. If the Union agreed to the early termination, SUPERVALU would make additional payments to its employees as consideration for the agreement.

7

In May 2002, the Union and SUPERVALU signed a new agreement (the "Termination Agreement"). Under the Termination Agreement, the prior CBAs terminated at 11:59 p.m. on June 29, 2002. The Termination Agreement was identical to the prior CBAs, except that the provisions regarding SUPERVALU's contributions to the Fund were deleted. Additionally, the new terms provided that employees who were entitled to severance payments would receive a lump sum of $2,600 and that employees that continued working after June 30, 2002, would receive a $2.50 per hour salary increase.[2] The Agreement was ratified by the Union's members on May 31 and June 1, 2002.

SUPERVALU submitted its final contributions to the Fund on June 26, 2002. It also informed the Fund that its obligations to contribute ceased on June 29, when it would withdraw as a participating employer from the Fund. As SUPERVALU withdrew during the 2001-2002 plan year, it believed that it would not incur any withdrawal liability.

However, in February 2003, the Fund sent SUPERVALU a letter assessing $4,316,996 in withdrawal liability against SUPERVALU because it withdrew during the 2002-2003 plan year.[3] *See* 29 U.S.C. § 1382. The letter explained that after

_____

[2]Most employees continued working at the facility until July 27, 2002.

[3]The $4,316,996 was SUPERVALU's pro rata share, twenty-three percent, of the Fund's unfunded vested benefits at

conducting an investigation, the Fund believed that SUPERVALU entered the Termination Agreement with a principal purpose of evading or avoiding withdrawal liability in violation of ERISA § 4212(c).[4]  According to the Fund, even though the facility did not close until July 27, 2002, SUPERVALU withdrew on June 29, 2002, in order to avoid its share of the unfunded vested benefits that were expected to exist at the end of the 2001-2002 plan year.  Therefore, for purposes of calculating SUPERVALU's withdrawal liability, the Fund treated SUPERVALU as having withdrawn during the 2002-2003 plan year and ignored the June 29, 2002 date in the Termination Agreement in accordance with § 4212(c).

In a letter dated May 1, 2003, SUPERVALU requested a review of the Fund's demand letter as allowed under the Fund's withdrawal liability procedures and the applicable statutory provisions, *see* 29 U.S.C. § 1399.  SUPERVALU argued that its contribution obligations ended on June 29, 2002.  Additionally, SUPERVALU argued that the Termination Agreement was a

---

the end of the 2001-2002 plan year.  *See*, *e.g.*, 29 U.S.C. 1391(b)(2)(A).

[4]The Fund's letter also asserted an alternative theory of liability:  SUPERVALU's obligations to employees who were injured during the 2001-2002 plan year continued into the 2002-2003 plan year.  As the Fund agreed during the proceedings before the Arbitrator to waive this argument, it is unnecessary for us to consider whether SUPERVALU could be held liable under such a theory.

9

bona fide, arm's length agreement which took it outside of ERISA's "evade or avoid" provision. Receiving no response to its letter, SUPERVALU initiated arbitration on October 23, 2002, pursuant to ERISA § 4221, 29 U.S.C. § 1401.

Before the Arbitrator, the parties made cross-motions for summary judgment and agreed to limit argument to the issue of whether SUPERVALU engaged in the transaction to evade or avoid liability under § 4212(c) of ERISA.[5] The Arbitrator found that § 4212(c) was unambiguous and that the plain language applied to the transaction at issue in this case. According to the Arbitrator, SUPERVALU was aware of its potential liability and persuaded the Union to enter the Termination Agreement to enable SUPERVALU to avoid the liability. The Union was willing to agree as SUPERVALU offered a bonus to each employee, as well as a pay increase for the remaining employees. Such an arrangement, according to the Arbitrator, fit squarely within the plain language of § 4212(c). Therefore, the Arbitrator granted summary judgment in favor of the Fund.

SUPERVALU filed a complaint in the District Court seeking to modify the Arbitrator's Award pursuant to ERISA

_____

[5]Depending on the outcome before the Arbitrator, the parties reserved questions such as whether SUPERVALU was required to continue contributing to the Fund on behalf of employees injured during the 2001-2002 plan year, and the calculations and methods used to determine the withdrawal liability. However, the parties later agreed not to make any additional arguments and the Arbitrator's Award became final.

10

§§ 4301 and 4221, 29 U.S.C. §§ 1451 and 1401. The case was initially heard by a magistrate judge, Francis X. Caiazza, and the parties made cross-motions for summary judgment. After considering the motions, the Magistrate Judge issued a report and recommendation, which proposed setting aside the Award. Additionally, the Magistrate recommended granting summary judgment in favor of SUPERVALU.

According to the Magistrate Judge, the Termination Agreement was not entered into to evade or avoid withdrawal liability. He recognized that SUPERVALU withdrew during the 2001-2002 plan year in order to effect a less costly withdrawal. However, in the Magistrate's view, because the Agreement was bona fide and made at arm's length, § 4212(c) was not applicable. The Magistrate rejected the Arbitrator's determination that the withdrawal date in the Termination Agreement should be disregarded. He explained that the date of withdrawal is determined by the CBA, or in this case the Termination Agreement, and a fund cannot simply disregard the CBA and choose the date of an employer's withdrawal. Such a rule would enable a fund to choose the date of withdrawal and prevent an employer and a union from entering an agreement to minimize withdrawal liability.

The Fund filed objections to the Magistrate's recommendations, but the District Court adopted the Magistrate's Report and Recommendations. The District Court held that the language of § 4212(c) was not plain, and had to be considered in light of the entire statutory scheme. Additionally, it agreed with the Magistrate's determination that the date of withdrawal is set by the Termination Agreement. The date of withdrawal is based

11

on a statutory formula – when the employer completely withdraws – and nothing in the record enabled the Court to find that a different withdrawal date applied. The District Court concluded by explaining that where it is not clear that an employer acted to evade or avoid, but rather acted to minimize, withdrawal liability, the court would not interfere. In order to find that SUPERVALU had violated § 4212(c), it would have had to alter the rules governing withdrawal liability, which was not within its province. Such an expansion of § 4212(c) would trump § 4212(a), and only Congress has the power to expand the provision. Therefore, the District Court granted summary judgment in favor of SUPERVALU.[6]

The Fund brought this timely appeal.

## II.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Our review of a district court's grant of summary judgment is plenary, and we employ the same standard used by the court below. *See Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 203 (3d Cir. 2005). "Summary judgment is appropriate when 'there is no genuine issue as to any material fact and . . . the

---

[6]The District Court amended its order on September 1, 2006, granting SUPERVALU's motion to require the Fund to refund to SUPERVALU the money that it paid in withdrawal liability. SUPERVALU had paid $3,948,569 to the Fund. The District Court ordered the refund (plus interest) within ten days of the order.

12

moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). All reasonable inferences must be drawn in favor of the non-moving party. *Id.* An arbitrator's findings of fact are subject to clear error review, but his or her legal conclusions are subject to *de novo* review. *See Crown Cork & Seal*, 982 F.2d at 860-61. The parties stipulated to the facts before the Arbitrator and District Court, so only a question of law remains.

## III.

The main issue in this appeal is whether SUPERVALU violated ERISA § 4212(c) by entering the Termination Agreement with the Union. Section 4212(c) provides that "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." 29 U.S.C. § 1392(c). The terms transaction, evade, and avoid are not defined in the statute, and therefore we must construe them in accordance with their ordinary and natural meaning, *United States v. E.I. DuPont De Nemours & Co., Inc.*, 432 F.3d 161, 171 (3d Cir. 2005), and "the overall policies and objectives of the statute," *United States v. Lowe*, 118 F.3d 399, 402 (5th Cir. 1997) (citing *Brown v. Gardner*, 513 U.S. 115, 117-19 (1994)).

The noun "transaction" means "[t]he act of transacting or the fact of being transacted," and the verb "transact" means "[t]o do, carry on, or conduct" or "[t]o conduct business." Am. Heritage Dictionary 1899-1900 (3d ed. 1992). The verb "avoid" means "[t]o stay clear of" or "[t]o keep from happening" and is

13

synonymous with escape. *Id.* at 128. The verb "evade" means "[t]o escape or avoid by cleverness or deceit" or "[t]o fail to make a payment of." *Id.* at 634. Under a plain language statutory reading the provision applies when a contributing employer enters a transaction with a principal purpose of escaping its duty to pay withdrawal liability to the plan or fund.

In *Dorn's Transportation, Inc. v. Teamsters Pension Trust Fund of Philadelphia & Vicinity*, 787 F.2d 897 (3d Cir. 1986), we called § 4212(c) a "good faith requirement." *Id.* at 902. The use of the term "good faith requirement" has led to confusion in this case. The good faith requirement was simply shorthand for the language of the statute: an employer cannot act in bad faith, i.e., with a principal purpose, of evading or avoiding withdrawal liability. By using such shorthand, we did not create an additional requirement that must be considered in determining whether the statute was violated. Rather, a principal purpose to evade or avoid connotes bad faith.

The facts of *Dorn's* are too dissimilar to the facts of this case for the opinion to provide much guidance. However, the case is important because we explained that § 4212(c) "was designed to guard against the intentional evasion of liability." *Id.* at 902. There was no violation in *Dorn's* because a "'principal purpose of the transaction' as a whole [was not] to escape liability." *Id.* In other words, § 4212(c) is violated when one of

14

the main reasons for entering a transaction is to effectuate that goal.[7]

There is no doubt that SUPERVALU had the intent required by the statute. SUPERVALU was aware of the significant withdrawal liability that it would incur by withdrawing during the 2002-2003 plan year when the facility closed and all covered operations ceased. Based on its desire to avoid such liability, SUPERVALU offered enhanced severance benefits and wages to the Union's members as consideration for the Union's agreement to enter the Termination Agreement. By entering the Termination Agreement, SUPERVALU withdrew

---

[7]SUPERVALU cites our decision in *Board of Trustees of the Trucking Employees of Northern Jersey Welfare Fund, Inc. - Pension Fund v. Centra*, 983 F.2d 495 (3d Cir. 1992), for the proposition that § 4212(c) should not be read literally. *Centra* dealt with a settlement between the fund and a withdrawing employer regarding withdrawal liability. *Id.* at 506-07. We held that the employer did not violate § 4212(c), despite the fact that it entered into the transaction to limit its liability, because the agreement was voluntarily entered into by both the fund and the employer. *Centra* cannot be construed as rejecting a literal interpretation of § 4212(c), but rather demonstrates that a principal purpose of the transaction must be to evade or avoid withdrawal liability. The employer did not agree to the settlement with a principal purpose of evading or avoiding liability, rather the principal purpose was to settle the claim and avoid liability within the larger context of "avoid[ing] the possibility of a larger adverse verdict at trial." *Id.*

15

from the Fund during the 2001-2002 plan year, which enabled it to avoid incurring the significant liability that existed for withdrawal during the 2002-2003 plan year. The record indicates that the only reason that SUPERVALU chose to renegotiate the CBAs less than a month before the facility closed was to bring its withdrawal date within the 2001-2002 plan year in order to avoid withdrawal liability for the 2002-2003 plan year.[8] As there was no other reason for SUPERVALU to enter the Termination Agreement, its intention to evade or avoid withdrawal liability was a principal purpose, if not its only purpose. Therefore, SUPERVALU acted with a principal purpose of escaping withdrawal liability in violation of § 4212(c).[9]

As noted above, when interpreting undefined terms in a statute, we may also consider the statute's policies and

---

[8]We note that this case does not present the question of whether SUPERVALU could have withdrawn without liability had it simply closed the facility before the end of the 2001-2002 plan year. As that question is not before us, it is unnecessary for us to determine whether such a situation would violate § 4212(c).

[9]We note that although the timing of SUPERVALU's withdrawal under the Termination Agreement was suspicious, our determination is not based on the fact that it withdrew on the last day of the 2001-2002 plan year. Rather, it is the transaction itself that violates the statute, regardless of what day SUPERVALU and the Union agreed to terminate the obligation to contribute to the Fund.

16

objectives. SUPERVALU's entering of the Termination Agreement was also contrary to the purpose of the MPPAA. As discussed above, Congress enacted the MPPAA to "protect multiemployer pension plans from the adverse consequences that result when individual employers terminate their participation or withdraw." *Warner-Lambert*, 791 F.2d at 284. By amending ERISA, Congress intended to prevent withdrawing employers from threatening the financial stability of a plan by requiring the employers to pay their share of unfunded vested benefit liability. *See Akron Casting*, 58 F.3d at 205-06. By renegotiating the CBAs in order to withdraw from the Fund, SUPERVALU engaged in exactly the type of conduct Congress was trying to prevent. That is, SUPERVALU's withdrawal threatened the financial stability of the Fund as SUPERVALU withdrew in order to avoid paying its share of the existing unfunded vested benefit liability. Therefore, SUPERVALU's conduct violated not only the plain language of the statute, but also its purpose.[10]

---

[10]The parties and the lower courts relied heavily on *Cuyamaca Meats, Inc. v. San Diego & Imperial Counties Butchers' & Food Employers' Pension Trust Fund*, 827 F.2d 491 (9th Cir. 1987). *Cuyamaca Meats* dealt with a transaction in which the employers violated the plain meaning of the statute, but did not frustrate the purpose of the statute. *Id*. at 499. Because the purpose of the statute was not frustrated, the court of appeals held that the employers did not violate the statute. *Id*. As it is clear that the transaction in this case also violated the purpose of the statute, it is unnecessary for us to decide whether we agree that such a situation does not violate the statute.

17

The arguments raised by SUPERVALU do not persuade us that it did not violate § 4212(c).[11]  First, it argues that as a matter of law it withdrew on June 29, 2002, when its obligation to contribute ceased.  SUPERVALU misunderstands the language of § 4212(c), which provides that any transaction that violates the provision must be disregarded.  As we have determined that the Termination Agreement violated § 4212(c), the Agreement must be disregarded.  Therefore, we return to the statute to determine when SUPERVALU actually withdrew.[12]

The date of complete withdrawal is the day on which the employer's obligation to contribute to the plan ceases or when all covered operations cease.  29 U.S.C. §§ 1383(a), (e).  Because

---

[11]It is unnecessary for us to reach the additional arguments made by the Fund as we hold that SUPERVALU violated the statute based on its plain and unambiguous meaning.

[12]We also reject SUPERVALU's argument that ignoring the Termination Agreement enables the Fund to just pick a withdrawal date, which it is not authorized to do under the MPPAA.  As evidenced by the discussion below, ignoring the Termination Agreement does not enable the Fund to pick SUPERVALU's withdrawal date on a whim.  Rather, once the Termination Agreement is out of the picture, we return to the statute, which provides that a withdrawal occurs when the obligation to contribute ceases, as dictated by a CBA, or when all covered operations cease.  *See* 29 U.S.C. §§ 1383(a), 1392(a).

18

we must ignore the Termination Agreement, the prior CBAs govern SUPERVALU's obligation to contribute. The prior CBAs required SUPERVALU to continue contributing until January 2003. However, the definition of a complete withdrawal is disjunctive; it is either when the obligation to contribute ceases or the cessation of all covered operations. SUPERVALU's cessation of all covered operations occurred before its obligation to contribute ceased. In other words, SUPERVALU actually withdrew when it ceased all covered operations. As noted above, we have defined "all covered operations" as "the substantial cessation of normal business activity." *Crown Cork & Seal*, 982 F.2d at 865-66. The facts indicate that normal business activity at the Belle Vernon facility substantially ceased on July 27, 2002, when most of SUPERVALU's employees were laid off and the facility was closed. Therefore, SUPERVALU completely withdrew from the Fund on July 27, 2002, when it ceased all covered operations.[13]

---

[13]Similarly, we reject SUPERVALU's argument that the Arbitrator misunderstood how to calculate withdrawal liability. It is clear from his decision that he understood that a statutory formula was used which based the amount of liability on the unfunded vested benefits existing in the plan year prior to the year in which the employer withdrew. To the extent that SUPERVALU appears to argue that the calculation of withdrawal liability was improper in this case, SUPERVALU has waived any such argument as it agreed to not make such an argument before the Arbitrator.

19

SUPERVALU's main argument is that § 4212(c) does not apply to bona fide collective bargaining agreements or other transactions that are negotiated at arm's length. Essentially SUPERVALU is suggesting, and the District Court agreed, that bona fide, arm's length transactions are exempt. We disagree.

As discussed above, § 4212(c) is unambiguous. The text in no way suggests that it only applies to sham or fraudulent transactions. The

> statutory criterion is not whether the transaction is a sham, having no purpose other than to defeat the goals of the [MPPAA] by leaving the other employers in the multiemployer pension plan holding the bag. It is whether the avoidance of withdrawal liability . . . is one of the principal purposes of the transaction.

*Sante Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 729-30 (7th Cir. 1994).

Additionally, SUPERVALU claims that there is some support for its proposition in the legislative history.[14] We will

---

[14]The lower courts engaged in extensive discussions of *International Typographical Union Negotiated Pension Plan & Ft. Worth Star Telegram*, 5 E.B.C. (BNA) 1193 (1984) (Mittelman, Arb.) (hereinafter "*ITU*"). According to the arbitrator, "evade or avoid" refers to fraudulent transactions, therefore, a bona fide transaction does not violate the provision.

not allow an examination of the legislative history to create an ambiguity where none exists in the statute. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 567-68 (2005). "[T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material." *Id.* at 568. Therefore, we reject SUPERVALU's claim that a bona fide arm's length transaction is not within the purview of § 4212(c).[15]

IV.

For the reasons stated above, we will reverse the District Court's grant of summary judgment in favor of SUPERVALU and remand the proceeding with directions that the District Court enforce the Arbitrator's Award.

---

*Id.* at 1197. In part, the arbitrator reached this decision based on legislative history. As explained above, we believe that the statute is clear and therefore we need not consider the legislative history. Additionally, we find no basis for the arbitrator's interpretation of the provision as only applying to fraudulent or sham transactions. Therefore, we are unpersuaded by *ITU*.

[15]We have fully considered the remaining arguments raised by SUPERVALU and we find them also to be without merit.

21