NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

Nos. 19-3499, 19-3504 & 19-3507

————————

STEELWORKERS PENSION TRUST,
by Daniel A. Bosh, Chairman,

Appellant in No. 19-3507

v.

THE RENCO GROUP, INC.; ILSHAR CAPITAL LLC;
BLUE TURTLES, INC.; UNARCO MATERIAL HANDLING, INC.;
INTEVA PRODUCTS LLC; THE DOE RUN RESOURCES CORPORATION;
US MAGNESIUM LLC,

Appellants in 19-3499 and 19-3504

————————

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action Nos. 2-18-cv-00142, 2-18-cv-01311 and 2-18-cv-01429)
District Judge: Honorable Cathy Bissoon

————————

Submitted under Third Circuit LAR 34.1(a)
On September 25, 2020

Before: AMBRO, PORTER and ROTH, <u>Circuit Judges</u>

(Opinion filed: August 26, 2021)

---

## OPINION[*]

---

ROTH, <u>Circuit Judge</u>

### I.

Plaintiff, The Renco Group, Inc., and six subsidiaries (collectively, Renco) appeal two summary judgment orders, and related preceding interlocutory orders, in actions brought in the United States District Court for the Western District of Pennsylvania under the Employee Retirement Income Security Act of 1974 (ERISA).[1]  Defendant Steelworkers Pension Trust (SPT) partially appeals from one of the summary judgment orders.  For the reasons stated below, we will affirm the District Court's orders in their entirety.

### II.

Renco formed RG Steel Holdings LLC (RG Steel) as a wholly owned subsidiary in 2011.  In March 2011, RG Steel purchased a number of steel mills and related properties.  As a result of this transaction, Renco became part of the controlled group that included RG Steel.  Some of RG Steel's businesses were contributing employers to SPT, a multi-employer pension plan.  By late 2011, RG Steel was in financial distress and losing approximately $1 million per day.  Renco began to seek outside financing for RG Steel.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] 29 U.S.C. §§ 1001–1500.

When it became clear that no entity would entertain lending to RG Steel without receiving some form of equity in exchange, Renco approached Cerberus Capital Management, L.P., with a mixed debt-equity proposal. Cerberus's attorneys submitted a draft transaction, involving two tranches of equity warrants, each conveying a 24.5% interest in RG Steel upon exercise of the warrants and/or satisfaction of additional conditions. Renco's counsel stated that Renco would prefer Cerberus to take ownership of 24.5% of RG Steel's membership units (*i.e.*, shares) immediately upon closing. Cerberus initially objected, but agreed to accept direct equity after repeated requests from Renco. After Renco's lawyers received confirmation that the transfer of membership units would not create an ERISA risk, the Cerberus transaction closed, and Renco claimed that it had exited RG Steel's controlled group. After the Cerberus transaction, RG Steel's financial position continued to decline. It entered bankruptcy and withdrew from SPT.

SPT entered proofs of claim in the RG Steel bankruptcy case asserting, *inter alia,* withdrawal liability claims. The parties tolled their dispute during the pendency of a related case against Renco by the Pension Benefit Guaranty Corporation (PBGC).[2] During the tolling period, on April 14, 2015, SPT emailed Renco a calculation of withdrawal liability payments. Renco defaulted, and SPT initiated proceedings in the District Court to collect payments. The District Court directed the parties to arbitration, and we affirmed.[3]

The Arbitrator ruled that Renco was required to make interim withdrawal liability payments to SPT beginning 60 days after SPT's April 14, 2015, email. After Renco again

---

[2] The record of the PBGC litigation was incorporated into the District Court's record in these actions.

[3] *See Steelworkers Pension Tr. v. Renco Grp., Inc.*, 694 F. App'x 69 (3d Cir. 2017).

refused, SPT initiated a new action in the District Court seeking interim payments and additional statutory damages.[4] Meanwhile, the Arbitrator ruled in SPT's favor on the merits of the withdrawal liability claim. SPT and Renco filed simultaneous actions seeking, respectively, to confirm and vacate the Arbitrator's award.[5] After the District Court denied Renco's motion to dismiss the interim payments action, Renco entered into a consent order with SPT to pay $78 million, the principal of the Arbitrator's final withdrawal liability award.

In response to summary judgment motions in both the confirmation/vacation and interim payments actions, the District Court entered two orders: one confirming the Arbitrator's final award (the Withdrawal Liability Decision), and one granting SPT interest, attorney's fees, and costs in the interim payments action (the Interim Payments Decision). Renco appealed both decisions and all interlocutory orders leading to the summary judgments, including the court's order denying its motion to dismiss the interim payments action. SPT also appealed the Interim Payments Decision.[6]

## III.[7]

---

[4] No. 18-cv-00142 (Bissoon, D.J.). 29 U.S.C. § 1132(g)(2) allows for interest, double interest, liquidated damages, attorney's fees, and costs on delinquent payments.

[5] The two confirmation/vacation lawsuits have been consolidated into one action, No. 18-1311 (Bissoon, D.J.).

[6] The only issue arising from the Interim Payments Decision is the interest rate used.

[7] The District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1451(c). We have jurisdiction under 28 U.S.C. § 1291.

Our review of the District Court's summary judgment grants is plenary,[8] as is our review of its denial of Renco's motion to dismiss.[9] We review the Arbitrator's findings of fact for clear error and his conclusions of law de novo.[10]

**IV**.

In the withdrawal liability action, the Arbitrator and the District Court found that the Cerberus transaction did not remove Renco from RG Steel's controlled group under the Multiemployer Pension Plan Amendments Act (MPPAA) because Renco had a principal purpose to evade or avoid withdrawal liability.[11] We owe the Arbitrator's withdrawal liability finding "great deference" in light of the MPPAA's strong policy toward arbitrating disputes of this kind.[12]

The thrust of Renco's position on appeal is that the Cerberus transaction's change in the type of equity exchanged from permanent warrants to membership units was merely a "clarifying contract edit" that had no dispositive effect on the transaction as a whole. For that reason, Renco contends that the Arbitrator and the District Court erred by focusing on the "evade or avoid" inquiry on this change. We conclude, however, that Renco's

---

[8] *SUPERVALU, Inc. v. Bd. of Trs. of Sw. Pa. & W. Md. Area Teamsters & Emps. Pension Fund*, 500 F.3d 334, 340 (3d Cir. 2007).

[9] *Keystone Redev. Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011).

[10] *Crown Cork & Seal Co. v. Cent. States Se. & Sw. Areas Pension Fund*, 982 F.2d 857, 860 (3d Cir. 1992) (citations omitted).

[11] *See* 29 U.S.C. § 1381 (obligating employers who exit multiemployer pension plans to pay withdrawal liability equaling the employer's share of the plan's unvested benefits); *id.* § 1301(b)(1) (extending withdrawal liability to businesses within the employer's common control); *id.* § 1392(c) ("If a principal purpose of any transaction is to evade or avoid [withdrawal liability], . . . liability shall be determined and collected . . . without regard to such transaction.").

[12] *Sherwin-Williams Co. v. N.Y. State Teamsters Conf. Pension, Ret. Fund.*, 158 F.3d 387, 392 (6th Cir. 1998); *see Chicago Truck Drivers v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1412 (7th Cir. 1989) ("The need for deference to the arbitrator's expertise is even more obvious on the issue of whether the seller sought to evade or avoid withdrawal liability.").

arguments misrepresent the record and reveal no error in the Arbitrator or District Court's reasoning.

First, Renco asserts that the District Court erred by failing to reconsider the Arbitrator's finding that the Draft Permanent Warrants Transaction was "perfectly permissible" under the MPPAA and would not have led to withdrawal liability absent the change to membership units.[13] The Arbitrator made no such finding. He merely stated that he could not conclude that the draft transaction would have removed Renco from the controlled group. The District Court did not fail to analyze the issue but reviewed the Arbitrator's findings and found no error of law. Nothing more was required.[14]

Nor did the Arbitrator err in finding that the draft transaction would not definitively have altered Renco's controlled group status. Breaking the controlled group required an immediate transfer to Cerberus of greater than 20 percent "of the profits interest or capital interest" in RG Steel.[15] Renco argues that this result was assured because the section of the draft transaction agreement governing discretionary distributions "would have immediately transferred to Cerberus a 24.5% capital and profits interest in RG Steel Holdings LLC."[16] The Arbitrator considered the section Renco cites but found that in light of other sections of the agreement, limiting Cerberus's right to share in RG Steel's distributions, the draft transaction as a whole would not have transferred to Cerberus more than 20 percent of "the full community of interest in the profits and losses of RG Steel

---

[13] Appellant's Opening Brief ("Op. Br.") 45.
[14] *Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129, 149 (1st Cir. 2013) (finding that courts may not take "the affirmative step of writing in new terms to a transaction or to create a transaction that never existed").
[15] 26 C.F.R. § 1.414(c)-2(b).
[16] Op. Br. 51 (emphasis omitted).

Holdings LLC prior to exercise [of the warrants]."[17] We agree with the District Court that the Arbitrator's findings are correct and properly supported by the record.

Renco makes much of its own "subjective belief" that the Cerberus transaction would remove it from RG Steel's controlled group even before the permanent warrants were changed to membership units. If it believed the change would have no effect, Renco argues, it defies logic to find that the change transformed the transaction from one without a purpose to evade or avoid to one with such a purpose. Far from warranting reversal, this fact hurts Renco's case. The Arbitrator's findings suggest that Renco was motivated by a purpose to avoid ERISA obligations as soon as it understood that it would need to give up equity as part of any outside financing transaction for RG Steel. Thus, Renco's statement that it sought to avoid withdrawal liability even *before* the final deal terms were agreed upon only strengthens the Arbitrator's conclusion.

We are similarly unpersuaded by Renco's position that the Arbitrator and District Court failed to properly consider whether the Cerberus transaction as a whole had a principal purpose to evade or avoid withdrawal liability. Renco's first argument to that effect—that the Cerberus transaction could not have had such a purpose because the Arbitrator found it was motivated by "a legitimate business reason . . . of introducing much needed capital" into RG Steel's depleted coffers[18]—ignores the fact that a transaction can have more than one "principal purpose" under the MPPAA.[19] Here, the Arbitrator found

---

[17] Joint Appendix (JA) 112.
[18] Op. Br. 73.
[19] *See Sherwin-Williams*, 158 F.3d at 395.

that the transaction had *two* principal purposes: one legitimate (to revitalize RG Steel), and one illegitimate (to evade withdrawal liability).

Renco next points to the Arbitrator's finding that it was not motivated by a desire to evade or avoid withdrawal liability when it decided to seek outside financing for RG Steel, leaning heavily on our statement in *SUPERVALU, Inc. v. Board of Trustees of Southwest Pennsylvania & Western Maryland Teamsters & Employers Pension Fund* that "[t]he main issue . . . is whether SUPERVALU violated [§ 1392(c)] by entering the [transaction at issue]."[20] But *SUPERVALU* did not limit the "evade or avoid" inquiry to the decision to seek out a particular type of transaction. Rather, under *SUPERVALU*, we must determine whether the decision to enter a particular transaction *as executed* was motivated by an improper purpose.[21] As the District Court put it, the Arbitrator answered that question in the affirmative by "examin[ing] the 'principal purpose that motivated the decision' to engage in the Cerberus transaction, and then examin[ing] the 'principal purpose that motivated the decision' about how to do so."[22] He found that the former decision was not motivated by a desire to evade or avoid withdrawal liability, but the second decision was. That was not error.

Finally, Renco claims that the switch from permanent warrants to membership units was merely intended to clarify the parties' existing agreement, and therefore could not possibly be the sole support for a finding that the transaction as a whole had an illegitimate purpose. This falsely assumes that the Arbitrator's finding was based solely on the change

---

[20] 500 F.3d 334, 340 (3d Cir. 2007).
[21] *Id*. at 341–42.
[22] JA 32 (citing *Sherwin-Williams*, 158 F.3d at 395).

to membership units. The District Court noted that "the Arbitrator . . . did not rely solely on the structure of the Cerberus Transaction."[23] Instead, he cited Renco's repeated requests for the change in structure; its efforts to conceal the transaction from the PBGC after the agency expressed withdrawal liability concerns; the amount of withdrawal liability at stake; and the "less than credible testimony of Renco's various witnesses."[24] We defer to the Arbitrator's well-supported findings of fact and find no error in his, or the District Court's, conclusions of law. Therefore, we will affirm the Withdrawal Liability Decision in full.

## V.

Renco also disputes its obligations under two provisions of ERISA § 4219 (codified at 29 U.S.C. § 1399), which governs interim payments during withdrawal liability disputes: § 1399(b), which requires plan sponsors to provide notice and demand of withdrawal liability to employers; and § 1399(c)(2), which requires employers to make interim payments beginning 60 days post-notice, notwithstanding any pending withdrawal liability challenges. Because Renco's arguments lack sufficient merit, we will affirm the District Court's order declining to dismiss the interim payments action.

We first address the issue of standing. SPT asserts that Renco waived any right to appeal its interim payments obligation in the parties' consent order. Not so. The consent order explicitly reserves Renco's right to "contest the withdrawal liability, and/or the amount of the withdrawal liability[.]"[25] SPT's cases relating to consent judgments that resolve a case with finality are misplaced here, where the consenting party merely agreed

---

[23] JA 31.
[24] *Id.*
[25] JA 2622.

9

(in relevant part) to pay the principal amount assessed by an arbitrator.[26] Renco had standing to appeal the District Court's order denying its motion to dismiss the interim payments action.

Nevertheless, Renco has not shown any basis for absolving its obligation to make payments. Renco cites *Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. – Pension Fund v. Centra*,[27] which stated in a footnote that "a Fund may not collect even interim payments" until "a court makes the threshold determination that a company is a member of a control group."[28] *Centra* does not control here. There, the parties disputed whether Centra had entered a company's control group in a pre-withdrawal acquisition, so the withdrawal liability inquiry necessitated a threshold legal determination of the defendant's controlled group status before arbitration could begin.[29] On the other hand, in an "evade or avoid" context, the controlled group inquiry is inseparable from the arbitrator's determination of the transaction's purpose.[30] Thus, the parties' dispute did not toll Renco's payments obligation, which began 60 days after SPT's demand.

We also find that SPT's April 14, 2015, email setting out calculations for withdrawal liability payments satisfies the notice and demand requirements of § 1399(b). Renco points out that the email indicated a willingness on SPT's part to negotiate the payment

---

[26] *See In re Odyssey Contracting Corp.*, 944 F.3d 483, 489 (3d Cir. 2019); *Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203 F.3d 218, 223 (3d Cir. 2000); *cf. Brzozowski v. Corr. Physician Servs., Inc.*, 360 F.3d 173, 176–77 (3d Cir. 2004); *Verzilli v. Flexon, Inc.*, 295 F.3d 421, 425 (3d Cir. 2002).

[27] 983 F.2d 495 (3d Cir. 1992).

[28] *Id*. at 502 n.10.

[29] *Id*. at 501.

[30] *See Flying Tiger Line v. Teamsters Pension Tr. Fund of Phila.*, 830 F.2d 1241 at 1248, 1250 (3d Cir. 1987).

calculations. But nothing in the MPPAA states that a notice and demand must memorialize a final agreement between the parties; indeed, the statute contemplates disputes over payment amounts and schedules.[31] Renco also asserts that the term "demand" requires "an assertion of rights" or "an imperative request" that Renco make payments immediately, and the term "schedule" requires a breakdown of "when payments were allegedly due."[32] But the email contained both: it asserted SPT's position regarding its right to seek withdrawal liability from Renco, and calculated 11 quarterly payments, setting out a predictable schedule if the MPPAA's default 60-day deadline were applied to the first payment.[33] For these reasons, the District Court correctly declined to dismiss the interim payments action.

The final issue on appeal is the proper interest rate for the interim payments. We hold that the District Court was right to apply the "default" rate covering actions for delinquent plan contributions under 29 U.S.C. § 1132(g)(2) and 26 U.S.C. § 6621.[34]

Renco asserts that the court should have applied the PBGC's rate in 29 C.F.R. § 4219.32(b), as set out in the MPPAA's section covering unpaid withdrawal liability (29 U.S.C. § 1399(c)(6)). Courts are split on the issue of whether § 1132(g)(2) or § 1399(c)(6) should apply to interim payments in a withdrawal liability dispute.[35] We find those cases

---

[31] *See* 29 U.S.C. § 1399(c)(2) (mandating payments "notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule").

[32] Op. Br. 89–90 (internal quotation marks and emphasis omitted).

[33] Renco also argues that the Magistrate and Arbitrator erred by using a "substantial compliance" standard to find that the email met the statute's requirements. We need not opine on this issue because the email strictly complies with § 1399(b).

[34] *See* § 1132(g)(2) (instructing courts to apply the underpayment rate set out in 26 U.S.C. § 6621(a)(2)).

[35] *See GCIU-Emp. Ret. Fund v. Quad/Graphics, Inc.*, 2017 WL 1903102, at *6 (C.D. Cal. May 8, 2017) (collecting cases).

11

applying § 1132(g)(2) more persuasive: Section 1132(g)(2) specifically covers actions to compel disputed withdrawal liability payments (as here),[36] while § 1399(c)(6) appears to apply to the collection of overdue withdrawal payments when liability is not disputed.[37] And application of § 1132(g)(2)'s higher rate in the context of a withdrawal liability dispute is in keeping with that section's purpose to deter unnecessary litigation by employers.[38] Thus, the District Court was correct not to use the PBGC's rate.

Section 1132(g)(2) provides that the IRS' default underpayment rate under § 6621 applies unless the pension plan specifies a different rate. SPT argues that the District Court should have used the delinquent contributions rate in the Plan's Declaration of Trust, which is silent on unpaid withdrawal liability. Here, too, the District Court had it right. ERISA requires that we treat delinquent contribution and withdrawal liability actions "in the same manner."[39] Accordingly, if a plan specifies an interest rate for delinquent contributions, it should be used in a delinquent contributions action. And if a plan specifies a rate for withdrawal liability payments, it should be used in a withdrawal liability action. This is a

---

[36] *See id.*

[37] *See Carriers Container Council, Inc. v. Mobile S.S. Ass'n., Inc., AFL-CIO Pension Tr.*, 948 F.2d 1219, 1227 (11th Cir. 1991) ("[T]he most reasonable construction of ERISA is that § 1132(g)(2) applies exclusively when suit has been filed regarding an employer's withdrawal liability."). Renco cites cases applying the PBGC rate in actions to compel overdue withdrawal liability payments, casting doubt on the District Court's statement that "it appears . . . § 4219.32 applies only where overdue withdrawal payments are collected before litigation commences." But Renco's cases are distinguishable: none involved an action disputing the fact or principal amount of the employer's withdrawal liability.

[38] *See United Auto Workers Loc. 259 Soc. Dep't. v. Metro Auto Ctr.*, 501 F.3d 283, 295 (3d Cir. 2007).

[39] 29 U.S.C. § 1451(b).

withdrawal liability action, and the plan specifies no withdrawal liability rate.[40] Therefore, the default rate in § 6621 applies.[41]

## **VI**.

For the foregoing reasons, the orders and judgments of the District Court will be affirmed.

---

[40] We agree with the District Court's decision not to follow *Quad/Graphics'* finding that "the interest rate . . . in the trust agreement appli[es] to delinquent withdrawal payments even though on their face they apply only to delinquent contributions." 2017 WL 1903102 at *5.
[41] *Trustees. of the Amalgamated Insurance Fund v. Sheldon Hall Clothing, Inc.*, 862 F.2d 1020 (3d Cir. 1988), is inapposite. In that case, we applied a plan's specified interest rate to interim payments under § 1132(g)(2), but neither the Court nor the parties stated whether the plan's interest rate was for withdrawal liability payments or delinquent contributions. *Id.* at 1023.