PITTSBURGH MACK SALES & SERVICE, INC., doing business as Pittsburgh Truck Center, Appellant

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL UNION NO. 66.

No. 07–3938.

United States Court of Appeals, Third Circuit.

Argued Sept. 29, 2008.

Filed Sept. 4, 2009.

James P. Thomas (Argued), Richard I. Thomas, Pepper Hamilton LLP, Pittsburgh, PA, for Appellant.

Joshua M. Bloom (Argued), Joshua M. Bloom and Associates, P.C., Pittsburgh, PA, for Appellee.

Before: FISHER, CHAGARES, and HARDIMAN, Circuit Judges.

## OPINION OF THE COURT

CHAGARES, Circuit Judge.

This case requires us to determine whether an agreement by a union to purportedly indemnify or hold harmless an employer for the employer's withdrawal liability to a pension plan under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA"), and the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381–1461 ("MPPAA"), is unenforceable because it violates public policy. We hold that it is not. As a result, we will vacate the District Court's judgment to the contrary and will remand this matter to the District Court.

### I.

Pittsburgh Mack Sales & Service, Inc. ("Pittsburgh Mack") serviced and sold Mack Trucks.[1] At issue are two Collective Bargaining Agreements ("CBAs") between Pittsburgh Mack and the International Union of Operating Engineers Local Union No. 66 (the "Union"). The CBAs were effective January 13, 2004 through January 12, 2007, and applied to certain groups of employees at Pittsburgh Mack's Pittsburgh, Pennsylvania, facility. The CBAs provided, *inter alia*, that Pittsburgh Mack would make specific contributions to the Operating Engineer Construction Industry and Miscellaneous Pension Fund (the "Fund")—a multiemployer pension fund covered by ERISA and the MPPAA—and that the Union would hold Pittsburgh Mack harmless for liability to the Fund in excess of its specified contribution. Specifically, the relevant section of the CBAs (hereinafter "Section 1 of the CBAs") provided:

> During the term of this Agreement, the employer agrees to contribute to [the Fund] for each man hour paid [ ] to the Employees covered by this Agreement . . . $1.65.
>
> The Union will hold [Pittsburgh Mack] harmless for any liability to the Fund for any amounts claimed over and above this hourly contribution.

Appendix (App.) 66, App. 104.[2] Pittsburgh Mack made all of the hourly contributions

---

1. The facts set forth are drawn from the complaint and because this is an appeal of an order granting a motion to dismiss, we will accept the allegations of the complaint as true.

2. Pittsburgh Mack contends that the "hold

to the Fund required under Section 1 of the CBAs. The CBAs also contained a "successor clause," which provided that the contract would be binding on a new owner if Pittsburgh Mack was purchased by an outside third party.

On October 5, 2005, during the period that the CBAs were in effect, Pittsburgh Mack executed a letter of intent to sell substantially all of its assets to Allentown Mack. During the following two weeks, "the Union voluntarily negotiated a new labor agreement and/or agreements with Allentown Mack to govern the wages, hours and other conditions of employment for the bargaining unit employees of Allentown Mack after it purchased the assets of Pittsburgh Mack." App. 37 (Complaint ¶ 11). A product of the Union's bargaining with Allentown Mack was that "the Union eliminated agreement provisions requiring hourly contributions to the Fund on behalf of the bargaining unit employees." *Id.* (Complaint ¶ 12). Pittsburgh Mack had no involvement in the negotiations between the Union and Allentown Mack.

Pittsburgh Mack and Allentown Mack entered into an Asset Purchase Agreement on December 19, 2005. In a letter dated November 20, 2006, the Fund notified Pittsburgh Mack of its determination that Pittsburgh Mack had "incurred a complete withdrawal from the Plan on December 31, 2005," and made a demand on Pittsburgh Mack for the resulting withdrawal liability in the amount of $413,389 plus interest.

In a letter dated November 29, 2006, Pittsburgh Mack advised the Union of the Fund's demand and, in turn, demanded that the Union indemnify or otherwise hold it harmless for the withdrawal liability. Pittsburgh Mack, in support of its demand on the Union, cited Section 1 of the CBAs and argued that because "the alleged withdrawal liability to the Plan is in addition to, and in excess of, Pittsburgh Mack's required hourly contribution, [the Union] is responsible for this withdrawal liability to the Plan." App. 125. The Union has refused to indemnify or hold harmless Pittsburgh Mack for the withdrawal liability to the Fund.

Pittsburgh Mack brought a declaratory judgment action seeking a determination that pursuant to Section 1 of the CBAs, the Union is obligated to indemnify it or hold it harmless against claims for withdrawal liability by the Fund. The Union moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing, *inter alia:* (1) the District Court lacked jurisdiction; (2) Pittsburgh Mack's claims were not ripe; and (3) Section 1 of the CBAs was unenforceable because it was contrary to public policy.

After considering a Magistrate Judge's Report and Recommendation ("R & R"), the District Court granted the Union's motion to dismiss and adopted the R & R. The District Court determined that Section 1 of the CBAs was "unenforceable as contrary to the public policy manifested in ERISA and the MPPAA." *Pittsburgh Mack Sales & Serv., Inc. v. International Union of Operating Engineers,* No. 07–00092, 2007 WL 2907950, at *8 (W.D.Pa. Sept. 30, 2007). In support of its determi-

---

harmless" language was put in the CBAs as *quid pro quo* for Pittsburgh Mack's agreement to make the defined hourly contributions, and that the language shows that the Union agreed to hold Pittsburgh Mack harmless or indemnify it for any liability to the pension fund above the $1.65 per man hour contribution. The Union counters that the pension contributions were *quid pro quo* for the work that the employees were performing, and that the Union did not agree to hold Pittsburgh Mack harmless for liability to the pension fund created by Pittsburgh Mack's own conduct. Although we note this factual dispute, we do not decide this issue on appeal as it is more appropriate for the District Court to consider, if necessary, on remand.

nation, the District Court noted that the "controlling principle" of the case "is that Congress' intent that withdrawal liability under the MPPAA be born by the employer, and that the employees' retirement benefits be thereby protected, may not be defeated by private contractual arrangement." *Id.* at * 1. This appeal followed.

## II.

### A.

■ Pittsburgh Mack alleges that the District Court had jurisdiction pursuant to section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Section 301 provides that:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). The Union contends that there is no jurisdiction under section 301 once a CBA has been terminated. It further contends that because the CBAs were terminated when Pittsburgh Mack no longer employed Union workers, the District Court lacked jurisdiction. Pittsburgh Mack responds that the CBAs were not terminated. It is unnecessary for us to resolve whether or not the CBAs were terminated, however, because despite the Union's assertions to the contrary, the existence of a contract is not a jurisdictional element of a section 301 claim.

This Court has, in the past, noted that "a prerequisite for section 301 jurisdiction is a contract between the employer and labor organization." *International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 249 v. W. Pa. Motor Carriers Ass'n,* 660 F.2d 76, 83 (3d Cir.1981). However, after the Supreme Court's decision in *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006), this is no longer the case.

In *Arbaugh,* the Supreme Court addressed concerns that courts were conflating and confusing subject matter jurisdiction with the need to prove the essential elements of a claim for relief. *Id.* at 511, 126 S.Ct. 1235. The Court adopted a "bright line" test to determine whether a statute (or a provision thereof) was jurisdictional or part of the merits. *Id.* at 515–16, 126 S.Ct. 1235. The test, the Court in *Arbaugh* explained, is as follows:

> If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

*Id.* (citation and footnote omitted).

The Court of Appeals for the Sixth Circuit in *Winnett v. Caterpillar, Inc.,* 553 F.3d 1000, 1006, 1007 (6th Cir.2009), applied the *Arbaugh* test to the question of whether the existence of a union contract is a jurisdictional prerequisite under section 301. The court in *Winnett* held that the existence of a union contract is not a jurisdictional prerequisite under section 301 because Congress did not "clearly state[ ]" that the existence of such a contract was a limit on subject matter jurisdiction. *Id.* at 1006. In so holding, the court in *Winnett* analyzed section 301, noting that the only time jurisdiction is mentioned in the statute is in the context of personal jurisdiction. *Id.* The court observed that the statute actually "relaxes subject-matter jurisdiction by permitting federal courts to handle such cases without regard to the amount in controversy or the

existence of diversity jurisdiction." *Id.* Finally, the court explained that because "*[a]ll* of the elements of a plaintiff's prima facie case for the breach of a union contract appear in the same subsection," a finding that the existence of a union contract had jurisdictional consequences would necessitate a finding that all of the other parts of the subsection were also jurisdictional in nature. *Id.* (emphasis in original). The court concluded that even if *Arbaugh* was not considered, such a finding would suggest that "Congress intended to create a cause of action that has no non-jurisdictional elements," a result that the court was "reluctant" to reach. *Id.*

We adopt the reasoning of the Court of Appeals for the Sixth Circuit in *Winnett* and hold that the existence of a union contract is not a jurisdictional requirement under section 301. Regardless of whether or not the CBAs were terminated, then, the District Court had jurisdiction under section 301. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

### B.

The Union also contends that Pittsburgh Mack's claim is not ripe. Article III of the Constitution limits the "judicial Power" of the United States to the adjudication of "Cases" or "Controversies." U.S. Const. art. III, § 2. Courts enforce the case-or-controversy requirement through several justiciability doctrines that " 'cluster about Article III.' " *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (quoting *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178–79 (D.C.Cir.1982) (Bork, J., concurring)). They include standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions. *See DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006).

■ The ripeness doctrine determines "whether a party has brought an action

prematurely, and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." *Peachlum v. City of York,* 333 F.3d 429, 433 (3d Cir.2003) (citation omitted). However, "[r]ipeness is a matter of degree whose threshold is notoriously hard to pinpoint." *NE Hub Partners, L.P. v. CNG Transmission Corp.,* 239 F.3d 333, 341 (3d Cir.2001). This is especially so in declaratory judgment actions "because declaratory judgments are typically sought before a completed injury has occurred." *Pic–A-State Pa., Inc. v. Reno,* 76 F.3d 1294, 1298 (3d Cir.1996).

■ In *Step–Saver Data Systems, Inc. v. Wyse Tech.,* 912 F.2d 643 (3d Cir.1990), we outlined the test to determine ripeness in the declaratory judgment context. First, we analyze the "adversity of the interest of the parties." *Id.* at 647. Though "a plaintiff need not suffer a *completed* harm to establish adversity of interest between the parties," "to protect against a feared future event, the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Armstrong World Indus., Inc. v. Adams,* 961 F.2d 405, 412 (3d Cir.1992) (quotation marks, citations, and alterations omitted) (emphasis added). We have held that a potential harm that is "contingent" on a future event occurring will likely not satisfy this prong of the ripeness test. *See Step–Saver,* 912 F.2d at 647–48; *Armstrong,* 961 F.2d at 413.

■ Second, we look to "the conclusiveness of the judicial judgment." *Step–Saver,* 912 F.2d at 647. In analyzing this factor, we must "determine whether judicial action at the present time would amount to more than an advisory opinion based upon a hypothetical set of facts." *Presbytery of N.J. of the Orthodox Presby-*

*terian Church v. Florio,* 40 F.3d 1454, 1468 (3d Cir.1994). "[P]redominantly legal questions are generally amenable to a conclusive determination in a preenforcement context," so long as Article III standing exists. *Id.* Third, we look to "the practical help, or utility, of that judgment." *Step–Saver,* 912 F.2d at 647. If all three of these requirements are met, the claim is ripe. *Travelers Ins. Co. v. Obusek,* 72 F.3d 1148, 1154 (3d Cir.1995). *But see Armstrong,* 961 F.2d at 412 (citing *Step–Saver,* 912 F.2d at 647) (explaining that this list is not "exhaustive of the principles courts have considered in evaluating ripeness challenges.").

The Union contends that Pittsburgh Mack has failed to meet these three factors. It argues that the first *Step–Saver* factor has not been established because Pittsburgh Mack has not yet actually paid any withdrawal liability, and therefore has suffered no harm. Instead, payments have been made by Robert Arnoni, the sole remaining shareholder of Pittsburgh Mack. The Union also argues that the second *Step–Saver* factor has not been established because the Fund could pursue withdrawal liability "against other individuals or commonly controlled companies," and the declaratory judgment would therefore be inconclusive. Union Br. at 39. Third, the Union claims that a judgment in this case would not be "practical" because the Fund could pursue withdrawal liability against other entities, and therefore the third *Step–Saver* factor has not been established.

■ We disagree with the Union on all three of these points, and hold that this case is ripe for adjudication. Our analysis in *Step–Saver* is instructive here. In *Step–Saver,* the plaintiff, Step–Saver, sought a declaratory judgment that the defendant was liable to it if collateral actions filed by Step–Saver's customers established a defect in the products sold by the defendants to Step–Saver, and subsequently by Step–Saver to its customers. *Step–Saver,* 912 F.2d at 645. We held that Step–Saver's declaratory judgment request was not ripe. Step–Saver's request was based on a "contingency"—the determination that the defendant was responsible to Step–Saver was only relevant if the actions between Step–Saver and the consumers resulted in Step–Saver's liability based on the defendant's actions. *Id.* at 647. This contingency, coupled with the fact that the defendant did not yet have to admit or deny liability to Step–Saver based on the alleged defects in the products, resulted in an insufficient adversity of interests between Step–Saver and the defendant. *Id.* at 647–48. *See also Armstrong,* 961 F.2d at 413 (finding that the adversity of interest prong was not met because the plaintiffs' complaint was based on a contingency—that of a takeover attempt of a corporation in violation of Pennsylvania law and the subsequent hypothetical actions of the directors of the corporation). The facts in *Step–Saver* are distinguishable from those in this case. Here, the interests of the parties are sufficiently adverse because the Union has explicitly refused to indemnify or hold Pittsburgh Mack harmless for the withdrawal liability. Furthermore, Pittsburgh Mack's claim is not based on a contingency—it has already received correspondence from the Fund that Pittsburgh Mack is liable for withdrawal liability.[3] The first *Step–*

---

**3.** The Union is correct that, in general, to pursue an indemnity claim, the indemnitee must have made a payment to a third party, and here Pittsburgh Mack has not done so. *See Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107, 122 (3d Cir.1992). However, at this juncture, Pittsburgh Mack is not seeking actual monetary indemnification from the Union. Rather, it only seeks a declaration that the Union has agreed to indemnify Pittsburgh Mack for any liability above and beyond the payment of $1.65 per man hour to the pen-

*Saver* factor, then, points in favor of a finding of ripeness.

In *Step–Saver,* we also determined that the second factor, the conclusiveness of the judgment, was not met because Step–Saver's request for declaratory relief was itself based on a contingency, so "even if we issued the requested declaration, the legal status of the parties would not change (nor would it be clarified), because our declaration itself would be a contingency." 912 F.2d at 648. Here, in contrast, the declaratory judgment will be conclusive because it will establish whether the Union is obligated to indemnify or hold harmless Pittsburgh Mack (or some derivative of it) for the withdrawal liability.

Finally, in *Step–Saver,* we found that the third factor, the utility of the judgment, was not satisfied because Step–Saver would take the same steps whether or not it was granted a declaratory judgment. *Id.* at 650. In the present case, however, determining this issue is practical and useful because at the conclusion of Pittsburgh Mack's declaratory judgment action, it will know whether or not it can proceed with an indemnification suit against the Union for any withdrawal liability it has incurred. This case is therefore ripe for adjudication.

### C.

■ This Court's review of the District Court's order granting the Union's motion to dismiss is de novo. *McTernan v. City of York, Pa.,* 564 F.3d 636, 646 (3d Cir. 2009). In analyzing a motion to dismiss, "[w]e must 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable read-

ing of the complaint, the plaintiff may be entitled to relief.'" *Id.* (quoting *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008)). "A complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Id.* (citation omitted).

### III.

■ Pittsburgh Mack argues that public policy does not bar enforcement of Section 1 of the CBAs because "Pittsburgh Mack would still be primarily liable to the Fund for the withdrawal liability, the Fund would still be fully insulated from Pittsburgh Mack's withdrawal, the Union employees still would receive their full pension benefits, the MPPAA's stated goal of ensuring fully-funded pension benefits would still be achieved, and the integrity of the collective bargaining process would be maintained." Pittsburgh Mack Br. at 11. We will accept, as we must, Pittsburgh Mack's contention that Section 1 of the CBAs constitutes an agreement by the Union to indemnify or hold it harmless from withdrawal liability. For the reasons that follow, we will vacate the judgment of the District Court and remand for further proceedings.

■ Courts may not enforce a contract—including a collective bargaining agreement—that violates public policy. *See W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) (observing that "a court may not enforce a collective-bargaining agreement

---

sion fund. Therefore, whether any payments have been made or by whom is irrelevant. *Cf. Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d 164, 169 (3d Cir.2002) ("With regard to alter ego liability in cases involving claims to pen-

sion benefits protected by ERISA, as amended by the MPPAA, there is a federal interest supporting disregard of the corporate form to impose liability." (quotation marks, citation, and emphasis omitted)).

that is contrary to public policy"); *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 356–57, 51 S.Ct. 476, 75 L.Ed. 1112 (1931); *see also Fields v. Thompson Printing Co., Inc.*, 363 F.3d 259, 268 (3d Cir.2004) ("It is axiomatic that a court may refuse to enforce a contract that violates public policy."). Because the phrase "public policy" is vague, courts must find "definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy." *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945). The Supreme Court has instructed that public policy "must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. 2177 (quoting *Muschany*, 324 U.S. at 66, 65 S.Ct. 442). Accordingly, the principle that courts may not enforce a contract that violates public policy is "cautiously applied" by the courts "only in clear cases." *Steele v. Drummond*, 275 U.S. 199, 205, 48 S.Ct. 53, 72 L.Ed. 238 (1927); *see Twin City*, 283 U.S. at 356, 51 S.Ct. 476 (noting that the principle "should be applied with caution and only in cases plainly within the reasons on which that doctrine rests").

We now examine "the law and legal precedents" to determine whether there exists public policy that would compel a court not to enforce Section 1 of the CBAs.

## A.

ERISA was enacted in 1974 "after careful study of private retirement pension plans." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). One of the "principal purposes of this comprehensive and reticulated statute was to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Id.* (quotation marks and citation omitted); *see also Foodtown, Inc.*, 296 F.3d at 168 ("ERISA was enacted by Congress to protect employees' pension rights."). Indeed, "Congress wanted to guarantee that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Pension Benefit Guar. Corp.*, 467 U.S. at 720, 104 S.Ct. 2709 (quotation marks and citation omitted); *see Concrete Pipe and Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 607, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993).

The MPPAA is an amendment to ERISA. Before it was enacted, "many employers were withdrawing from multiemployer plans because they could avoid withdrawal liability if the plan survived for five years after the date of their withdrawal," and Congress was concerned "'that ERISA did not adequately protect multiemployer pension plans from the adverse consequences that result when individual employers terminate their participation or withdraw.'" *SUPERVALU, Inc. v. Board of Trustees of Sw. Pa. & W. Md. Area Teamsters & Employers Pension Fund*, 500 F.3d 334, 336 (3d Cir.2007) (quoting *Warner–Lambert Co. v. United Retail & Wholesale Employee's Local No. 115 Pension Plan*, 791 F.2d 283, 284 (3d Cir.1986)). The MPPAA was therefore enacted and was "designed '(1) to protect the interests of participants and beneficiaries in financially distressed multiemployer plans, and (2) to encourage the growth and maintenance of multiemployer plans in order to ensure benefit security to plan participants.'" *Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. Pension Fund v. Centra*

*Inc.,* 983 F.2d 495, 504 (3d Cir.1992) (quoting H.R.Rep. No. 96–869, 96th Cong., 2d Sess. 71 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 2918, 2939); *see also Vornado, Inc. v. Trustees of the Retail Store Employees' Union Local 1262,* 829 F.2d 416, 420 (3d Cir.1987) ("[T]he amendments as a whole clearly were meant to facilitate effective plan management and protect the interests of beneficiaries and participants."); *Foodtown,* 296 F.3d at 168 (explaining that the MPPAA works to "protect the retirement benefits of covered employees"). *Cf. IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.,* 788 F.2d 118, 127 (3d Cir.1986) ("Courts have indicated that because ERISA (and the MPPAA) are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefit plans.").

To accomplish these goals, the MPPAA "requires that a withdrawing employer pay its share of the plan's unfunded liability," which "insures that the financial burden will not be shifted to the remaining employers" in the fund. *SUPERVALU,* 500 F.3d at 337; *see also* 29 U.S.C. § 1381(a); *Foodtown,* 296 F.3d at 168 ("[T]he MPPAA requires employers who withdraw from underfunded multiemployer pension plans to pay a withdrawal liability." (quotation marks and citation omitted)).

The pension fund "determine[s] whether withdrawal liability has occurred and in what amount." *SUPERVALU,* 500 F.3d at 337 (citing 29 U.S.C. §§ 1382, 1391). Under 29 U.S.C. § 1383(a), a "complete withdrawal ... occurs when an employer—(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a).

"[T]he amount of an employer's withdrawal liability is the employer's proportionate share of the unfunded vested benefits existing at the end of the plan year preceding the plan year in which the employer withdraws." *SUPERVALU,* 500 F.3d at 337 (citing 29 U.S.C. § 1391(b)(2)(A)); *see also Concrete Pipe,* 508 U.S. at 609, 113 S.Ct. 2264.

We hold that there are not enough "definite indications" of public policy in ERISA or the MPPAA to preclude an indemnification agreement between an employer and a third party for the employer's withdrawal liability, where the employer agrees that it will always remain primarily liable for the liability. We agree with the District Court that ERISA was designed to protect the pension benefits of employees, *see, e.g., Pension Benefit Guar. Corp.,* 467 U.S. at 720, 104 S.Ct. 2709; *Foodtown,* 296 F.3d at 168, and that to help accomplish this goal, Congress enacted the MPPAA, which created rules of withdrawal liability for employers to ensure the continued funding of the plan, *see Centra,* 983 F.2d at 504; *see also SUPERVALU,* 500 F.3d at 336–37. Nevertheless, these policy concerns are not specific enough to preclude the kind of indemnity agreement that Pittsburgh Mack contends it has with the Union here, where Pittsburgh Mack asserts that it will always remain primarily liable for its withdrawal liability. The purposes behind ERISA and the MPPAA—ensuring that pension funds will be adequately funded, even when employers withdraw from them, and that the employees who are relying on those funds will be protected—will be served even if indemnification agreements between employers and third parties are permitted, so long as the employer remains primarily liable for the funding.[4]

---

4. Pittsburgh Mack argues that the District Court engaged in improper fact finding when it determined that the employees who were members of the Union—and not the Union as a separate entity and signatory to the CBAs— would ultimately pay the withdrawal liability to the Fund if Section 1 of the CBAs is enforced. Pittsburgh Mack has conceded that it

### B.

The District Court relied upon the Supreme Court's decisions in *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), and *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993), two cases in which parties attempted to use private contracts to eliminate their withdrawal liability. In both cases, the Supreme Court explained that such contracts were impermissible in light of Congressional authority in enacting the MPPAA. *See Connolly*, 475 U.S. at 223–24, 106 S.Ct. 1018 ("F 'Contracts, however express, cannot fetter the constitutional authority of [the] Congress.... Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.'" (quoting *Norman v. Baltimore & Ohio R.R. Co.*, 294 U.S. 240, 307–08, 55 S.Ct. 407, 79 L.Ed. 885 (1935))); *id.* at 224, 106 S.Ct. 1018 ("If the regulatory statute is otherwise within the powers of Congress ... its application may not be defeated by private contractual provisions."); *Concrete Pipe*, 508 U.S. at 641–43, 113 S.Ct. 2264 (same). As a result, the Court held that the parties could not use private agreements to eliminate withdrawal liability. *See Concrete Pipe*, 508 U.S. at 605, 641–42, 113 S.Ct. 2264 (enforcing the MPPAA's assessment and arbitration provisions even though employer attempted to limit liability through private agreements); *Connolly*, 475 U.S. at 217–19, 223–24, 106 S.Ct. 1018 (applying rules of ERISA even though employers attempted to limit their liability to pension fund through private agreement); *cf. SU-*

*PERVALU*, 500 F.3d at 340–42 (finding an agreement was unenforceable and violated ERISA Section 4212(c), 29 U.S.C. § 1392(c), which prohibits "transaction[s]" whose "principal purpose" is "evad[ing] or avoid[ing] liability" when employer made agreement with union employees to avoid withdrawal liability).

Pittsburgh Mack, in contrast, is not attempting to eliminate withdrawal liability under the MPPAA—indeed, it admitted both in its briefing and at oral argument that it will always remain "primarily liable" for the payment of that liability. Rather, Pittsburgh Mack seeks to enforce a private contractual provision which may obligate the Union to indemnify it for its withdrawal payments. Enforcing a private contract in this context—one in which the employer will always be primarily liable for the withdrawal liability, ensuring the funding of the pension fund and thus protecting the pension benefits earned by employees—will not result in the purposes of ERISA or the MPPAA being "defeated," and therefore does not come within the ambit of the rule overriding private contracts in this arena, as stated in *Concrete Pipe* and *Connolly*.

\* \* \* \* \* \*

After analyzing "the law and legal precedents," including ERISA, the MPPAA, as well as the Supreme Court's decisions in *Connolly* and *Concrete Pipe*, we can discern no "well defined and dominant" public policy that would justify invalidating Section 1 of the CBAs. We hold that the District Court erred in granting the motion to dismiss. However, we express no opinion on the resolution of the various

---

will always remain primarily liable for the withdrawal liability to the Fund, and it is immaterial for purposes of this motion to dismiss whether the Union (through what Pittsburgh Mack describes as non-dues funds such as investments, dividends, rents, and

other income) or the employee/union members themselves would indemnify Pittsburgh Mack. The Fund will be compensated and the employees' pensions will be safe, thus satisfying the purposes of ERISA and the MPPAA.

issues raised by the parties that are either not pertinent to our analysis or not appropriately raised in the context of this motion to dismiss.[5]

## VI.

Accordingly, we will vacate the judgment of the District Court and remand for further proceedings.

---

**5.** We note that there are other issues raised by the parties, such as how to construe Section 1 of the CBAs and whether it is explicit enough to show that the Union agreed to indemnify Pittsburgh Mack; whether Pittsburgh Mack unilaterally made the decision to withdraw from the fund or whether the Union played any part in that withdrawal; and whether field preemption should bar Pittsburgh Mack's claim, among others. While the District Court touched on these issues below, its ultimate conclusions were explicitly based on whether, in the context of a motion to dismiss, a violation of public policy made Section 1 of the CBAs unenforceable. Accordingly, we will not address these issues.