# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 13, 2015       Decided February 26, 2016

No. 14–7162

DISTRICT NO. 1, PACIFIC COAST DISTRICT,
MARINE ENGINEERS' BENEFICIAL ASSOCIATION, AFL-CIO,
APPELLEE

v.

LIBERTY MARITIME CORPORATION,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01795)

*William G. Miossi* argued the cause for the appellant. *Mary M. Lenahan* was with him on brief.

*David M. Glanstein* and *Michael J. Barta* were on brief for the *amicus curiae* American Maritime Officers in support of the appellant.

*Mark J. Murphy* argued the cause and was on brief for the appellee.

Before: HENDERSON and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: Liberty Maritime Corporation (Liberty) appeals a district court order compelling it to arbitrate its ongoing labor dispute with District No. 1, Pacific Coast District, Marine Engineers' Beneficial Association, AFL-CIO (MEBA or the Union). For years, Liberty and MEBA were parties to successive collective bargaining agreements (CBAs) under which Liberty exclusively employed MEBA members as supervisory personnel on several of its bulk-carrier ships. The parties' relationship eventually soured, leading Liberty to replace its MEBA member-employees with those who belonged to a rival union. MEBA asserts that Liberty violated the parties' CBA in doing so. In response, Liberty claims that the parties' CBA had already expired before it switched unions. The parties' dispute thus boiled down to a principal inquiry: *When* did their CBA expire?

The district court determined that under the CBA, this question had to be submitted to arbitration; it therefore granted MEBA's request for an order compelling Liberty to arbitrate. *See Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.*, 70 F. Supp. 3d 327, 350 (D.D.C. 2014). On appeal, Liberty claims that the court erred in doing so. As a threshold matter, it claims that the court lacked subject matter jurisdiction over MEBA's suit. On the merits, it argues that the contract-duration question is not arbitrable; it maintains that the court, not an arbitrator, must decide when the CBA expired. We believe Liberty is wrong on both counts and, accordingly, affirm the district court.

3

**I.**

Liberty is a maritime shipping company with a fleet of vessels engaged in global trade. For over two decades, Liberty had a series of CBAs with MEBA, a union representing, *inter alia*, officers and engineers working in the United States maritime industry, both at ports and on ocean-going vessels. The most recent was slated to expire in June 2010. Negotiations over a successor CBA stalled and, on August 25, 2010, Liberty and MEBA signed a Memorandum of Understanding (MOU) extending the CBA to September 30, 2011.[1] Specifically, the MOU provided that the then-current CBA, along with the provisions of the MOU itself, constituted a "New Agreement."

Three provisions of the New Agreement are relevant. First, like its predecessors, the New Agreement provided that Liberty could employ *only* MEBA-represented engineers as supervisory personnel[2] aboard certain vessels. Second, the New Agreement included a grievance-and-arbitration provision establishing a detailed procedure to address disputes arising between Liberty and MEBA. Specifically, it required

---

[1] Although the CBA was to expire on June 15, 2010, it remained in effect per its terms until the MOU was signed, at which point the MOU applied retroactively to July 1, 2010. Thus, at no time from June 15 to August 25, 2010 did the CBA between Liberty and MEBA lapse.

[2] Under the most recent CBA, carried over into the New Agreement, the Liberty personnel to whom the agreement was applicable were deemed supervisors. As the district court noted, this meant that the protections of the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, did not generally apply to them; they could, however, secure and enforce terms and conditions of employment through a CBA, which is what they did here. *See Liberty Mar.*, 70 F. Supp. 3d at 334 n.2.

that "*[a]ll disputes* relating to the interpretation or performance of this Agreement shall be determined" by an arbitration board consisting of two MEBA representatives and two Liberty representatives. District No. 1, Pacific Coast District, M.E.B.A., Tanker Agreement § 2, at 10 (1986–1990) (Tanker Agreement) (emphasis added).[3] In the event the board could not resolve the grievance by mutual agreement or majority vote, an agreed-upon arbitrator was authorized to render a final, binding decision. Third, and most relevant, the New Agreement included a "Duration of Agreement" provision as follows:

> [The New Agreement will] continue in full force and effect *until midnight, September 30, 2011* and shall continue from year to year thereafter unless either the Company or the Union shall give written notice to the other of its desire to amend the agreement, which shall be given at least sixty (60) days, but no sooner than ninety (90) days, prior to the expiration date. In the event either the Company or the Union serves notice to amend the Agreement, the terms of the Agreement in effect at that time of the notice to amend shall continue in effect until mutual agreement on the proposed amendments *or an impasse has been reached*.

Mem. of Understanding (MOU) § 1 (emphases added).

---

[3] Both the exclusivity and grievance-and-arbitration provisions were incorporated into the New Agreement by reference to the original CBA. Both parties submitted the 1986–1990 "Tanker Agreement" to the district court to establish the CBA's governing provisions, and we assume the provisions included therein were those applicable in 2010.

In March 2011, the parties began negotiating a successor to the New Agreement. Liberty's primary issue was the Union's pension plan. MEBA operated under a defined-benefit plan but Liberty insisted that the Union shift to a defined-contribution plan—a change MEBA opposed. Several work-rule changes were also on the table. On July 5, 2011, Liberty notified MEBA that it intended to terminate the CBA on September 30, 2011, [4] and on July 8, MEBA responded by giving Liberty notice to amend, consistent with the Duration of Agreement provision. With MEBA's notice to amend, the New Agreement's expiration at midnight on September 30, 2011 then became contingent on the parties reaching "impasse" before that date.[5]  *See* MOU § 1.

---

[4] Counsel for Liberty acknowledged at oral argument that, although the New Agreement did not contain a "notice of termination" provision, Liberty considered its notice of termination to fall within the "notice to amend" language in the MOU. *See* Oral Arg. Recording at 18:55–19:13.

[5] Although Liberty's answer denied MEBA's allegation that "[b]ased upon the Union's timely notice to amend, the terms of the Agreement in effect at the time of the Notice continue to remain in effect pursuant to the terms of the parties' MOU," Answer ¶ 15, neither party seriously disputes that the contract's expiration at midnight on September 30 was contingent upon impasse. Rather, counsel for Liberty acknowledged that "[t]he durational language does contain reference to impasse; that's why . . . we believe the parties were at a bargaining impasse and no longer able to agree, thus the expiration on September 30." Oral Arg. Recording at 13:52–14:07. Moreover, Liberty maintains that the contract remained in effect until midnight on September 30 at the *earliest*; that is, even if the parties reached impasse before September 30, the contract did not expire until then. *See* Oral Arg. Recording at 14:09–14:22 ("We could not assert the contract expired September 27 because the durational clause . . . carried out [until] the end of the month.").

Whether Liberty and MEBA in fact reached impasse before September 30, 2011 is the underlying dispute in this case; Liberty claims they did and MEBA claims they did not. The dispute arises from a flurry of last-minute negotiations in the four days leading up to September 30. On September 27, MEBA told Liberty it was not able to accept the defined-contribution pension plan Liberty demanded. Liberty expressed its regret that the parties were unable to reach a deal and began taking steps to bring on another union, the American Maritime Officers (AMO), to fill the MEBA positions beginning at 12:01a.m. on October 1. On September 28, however, MEBA reversed course; its president first contacted Liberty's CEO by phone and then confirmed in writing that MEBA *would* accept the defined-contribution plan Liberty had proposed and invited Liberty back to the negotiating table to work out the remaining issues. On September 29, citing a lack of confidence in MEBA, Liberty rejected the invitation and maintained that the New Agreement was set to expire at midnight the following day, September 30, in accordance with its terms.

Early on September 30, MEBA submitted a formal grievance to Liberty, using the grievance-and-arbitration procedure set out in the New Agreement. The grievance alleged that Liberty had violated the New Agreement in three ways: (1) by "failing and refusing to recognize MEBA as the sole representative of its licensed engineers and deck officers"; (2) by ordering "duly authorized representatives of the MEBA illegally removed from the Company vessels"; and (3) by authorizing "the assignment of the customary work and supervisory jurisdiction of the officers to be performed by other non-vessel and non-union personnel." Ltr. from Bill Van Loo, MEBA Sec'y-Treasurer, to Philip Shapiro, Liberty President & CEO 1–2 (Sept. 30, 2011). In its grievance, MEBA demanded that Liberty cease and desist from these

actions. Liberty did not immediately respond; rather, that afternoon, its CEO notified its supervisory personnel that MEBA and Liberty "were unable to agree on terms for a new . . . labor agreement." Ltr. from Philip Shapiro, Liberty President & CEO, to Liberty Officers 1–2 (Sept. 30, 2011). At 12:01a.m. on October 1, 2011, MEBA members left Liberty's vessels and AMO members came on board.

MEBA subsequently filed additional grievances related to the New Agreement, which grievances Liberty refused to arbitrate; MEBA then filed this action to compel Liberty to do so. The district court granted MEBA's motion for summary judgment, holding, first, that it had jurisdiction to hear the suit, and second, that the question of impasse was arbitrable under the New Agreement's broad arbitration provision. *See Liberty Mar.*, 70 F. Supp. 3d at 350 ("This Court concludes that it properly may exercise subject matter jurisdiction over MEBA's claims because they arise under section 301 of the LMRA. Moreover, whether the parties' CBA was still in place at the time of all of the alleged violations is a question that arises under the durational provision of the contract, and is therefore a question for the arbitrator to decide."). Liberty timely appealed.

## II.

"We review a grant of summary judgment *de novo*." *Hairston v. Vance-Cooks*, 773 F.3d 266, 271 (D.C. Cir. 2014). "Summary judgment will be granted when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Id.* (quoting FED. R. CIV. P. 56(a)). On appeal, Liberty contends that MEBA was *not* entitled to judgment as a matter of law on the issue of arbitrability. Before reaching that issue, however, we must

address Liberty's challenge to the district court's jurisdiction to compel arbitration in the first place.

## A. Subject Matter Jurisdiction

The National Labor Relations Act of 1935 (NLRA), 29 U.S.C. §§ 151–169, establishes a federal regime for managing labor relations and generally authorizes the National Labor Relations Board (NLRB) to resolve disputes between labor organizations and employers. *See generally Vaca v. Sipes*, 386 U.S. 171, 178–79 (1967). The United States Supreme Court has held that the NLRB's jurisdiction is in general exclusive; that is, if a claim falls within the purview of the NLRB, state and federal courts are preempted from hearing it. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959). As the Court put it, "[w]hen an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the [NLRB]." *Id.* This rule is referred to as "*Garmon* preemption." *Wash. Serv. Contractors Coal. v. District of Columbia*, 54 F.3d 811, 815 (D.C. Cir. 1995).

The Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. §§ 141 *et seq.*, "carve[s] out" an exception to the NLRB's "exclusive jurisdiction." *Vaca*, 386 U.S. at 179. Specifically, section 301(a) of the LMRA grants a federal district court jurisdiction over "[s]uits for *violations of contracts* between an employer and a labor organization." 29 U.S.C. § 185(a) (emphasis added). Thus, if a labor dispute is contractual, *Garmon* preemption does not apply; instead, the aggrieved party can sue on the contract in federal court.

Some claims, however, can be *both* contractual and representational; that is, a claim that alleges that conduct violates a collective bargaining agreement and also constitutes an unfair labor practice or otherwise violates the NLRA.

Instead of forcing courts to shoehorn a hybrid claim into one category or the other, the Supreme Court has held that they retain jurisdiction to hear a contractual claim even if the claim is also representational. *William E. Arnold Co. v. Carpenters Dist. Council*, 417 U.S. 12, 16 (1974) ("When [conduct allegedly subject to the NLRA] also constitutes a breach of a collective-bargaining agreement, the [NLRB's] authority 'is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301 [of the LMRA].' " (quoting *Smith v. Evening News Ass'n*, 371 U.S. 195, 197 (1962))). In that event, the "labor case [falls] within the concurrent jurisdiction of the NLRB and the federal courts." *Mack Trucks, Inc. v. Int'l Union, UAW*, 856 F.2d 579, 585 (3d Cir. 1988); *accord Mullins v. Kaiser Steel Corp.*, 642 F.2d 1302, 1316 (D.C. Cir. 1980) ("[F]ederal courts have independent jurisdiction to decide cases alleging the breach of collective bargaining agreements, even though that very breach may also be an unfair labor practice."), *rev'd on other grounds*, 455 U.S. 72 (1982).

In many circuits, a party's mere assertion that a claim is contractual is not an automatic ticket to federal court; rather, the court must "examin[e] the major issues to be decided" and determine "whether they can be characterized as primarily representational or primarily contractual." *Local Union 204, Int'l Bhd. of Elec. Workers v. Iowa Elec. Light & Power Co.*, 668 F.2d 413, 419 (8th Cir. 1982); *accord, e.g., Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Air Prods. & Chems., Inc.*, 300 F.3d 667, 675 (6th Cir. 2002) ("simply referring to the claim as a 'breach of contract' [is] insufficient for purposes of § 301 federal courts' jurisdiction"; instead test is whether claim is "primarily representational"); *Pace v. Honolulu Disposal Serv., Inc.*, 227 F.3d 1150, 1156 (9th Cir. 2000) ("[An] end run around [the NLRA] . . . under the guise of contract interpretation . . . cannot be countenanced,

and we have drawn the jurisdictional line by asking whether the major issues to be decided . . . can be characterized as primarily representational or primarily contractual." (internal quotation marks and citations omitted) (ellipses in original)); *United Food & Commercial Workers Union, Local 400 v. Shoppers Food Warehouse Corp.*, 35 F.3d 958, 961 (4th Cir. 1994) (court is without jurisdiction if "a dispute is so primarily representational, that it falls solely within the Board's jurisdiction" (internal quotation marks omitted)); *Copps Food Ctr., Inc. v. United Food & Commercial Workers Union, Local 73-A*, No. 90-1905, 1991 WL 135508, at *2 (7th Cir. 1991) (unpublished) ("In answering the question of whether the federal court has jurisdiction to hear a contract-based dispute between a union and an employer, the court generally has to employ a difficult process of determining whether a particular dispute is primarily contractual—hence suited for § 301 federal court jurisdiction—or representational, requiring preliminary NLRB determination of the matter."); *see Trs. of Colo. Statewide Iron Workers (ERECTOR) Joint Apprenticeship & Training Trust Fund v. A & P Steel, Inc.*, 812 F.2d 1518, 1526 (10th Cir. 1987). If the court decides that the dispute is "primarily representational" even if framed as a breach of contract, the court defers to the NLRB's exclusive jurisdiction. *See, e.g.*, *Int'l Bhd. of Elec. Workers, Local 71 v. Trafftech, Inc.*, 461 F.3d 690, 695–97 (6th Cir. 2006).

Although we have not decided the parameters of a claim that is "primarily representational" as opposed to "primarily contractual," several of our sister circuits have done so. The Sixth Circuit has "identified two scenarios in which a dispute will be treated as 'primarily representational.' " *DiPonio Constr. Co., Inc. v. Int'l Union of Bricklayers & Allied Craftworkers, Local 9*, 687 F.3d 744, 750 (6th Cir. 2012) (quoting *Trafftech*, 461 F.3d at 695). The first occurs if the

NLRB "has already exercised jurisdiction over [the] matter and is either considering . . . or has already decided" the claim. *Id.* (quoting *Trafftech*, 461 F.3d at 695); *see also Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Olympic Plating Indus., Inc.*, 870 F.2d 1085, 1089 (6th Cir. 1989) ("In such cases where the Board's resolution of non-contractual issues could also resolve the controversial breach of contract claims brought under § 301, the federal courts should decline to exercise jurisdiction over the contractual allegations."). The second is "where the issue is an initial decision in the representation area," *DiPonio*, 687 F.3d at 750 (quoting *Trafftech*, 461 F.3d at 695); for example, where the court must decide whether the union was properly elected by the employees, *id.* (citing *Amalgamated Clothing & Textile Workers Union v. Facetglas, Inc.*, 845 F.2d 1250, 1253 (4th Cir. 1988)). At least one circuit contemplates a third scenario: a case in which the "center of the dispute" is a representational question, such as whether workers are "employees" or "supervisors" under the NLRA, but the NLRB has not yet taken up "the representation question at issue." *Morello v. Fed. Barge Lines, Inc.*, 746 F.2d 1347, 1349–50 (8th Cir. 1984) (internal quotation marks omitted).

Here, MEBA asserts that the district court's jurisdiction arises under section 301 of the LMRA. It argues that Liberty violated the parties' CBA and that its suit alleges a "violation of [the] contract[]" as section 301 requires. *See* 29 U.S.C. § 185(a). Liberty challenged that assertion in district court and does so again on appeal. Although somewhat garbled, Liberty's argument that the court lacks jurisdiction under section 301—or, at the very least, lacks jurisdiction unless the court determines the disputed impasse question—appears to be two-fold.

12

First, Liberty claims the existence of impasse *vel non* is a jurisdictional fact. As Liberty apparently sees it, if the parties did not reach impasse, the court had jurisdiction of the claim under section 301[6] but, if the parties did reach impasse, the court did not.[7] Liberty faults the district court for construing its jurisdictional challenge as a facial attack and for *assuming* MEBA's view that impasse was not reached in determining its jurisdiction under section 301; according to Liberty, the district court should have first *resolved* whether or not impasse occurred, a fact it dubs "jurisdictional." If the court had

---

[6] Liberty admits it employed AMO-represented officers and engineers beginning at 12:01a.m. on October 1, 2011. If the parties' CBA remained in effect past midnight on September 30, as MEBA contends, there can be no question that MEBA's suit would be for a violation of the contract and the court would have jurisdiction under section 301.

[7] Liberty starts with the premise that a court cannot exercise section 301 jurisdiction of a claim arising from conduct that took place *after* the contract expired. *See, e.g.*, *Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 25 (2d Cir. 1988) ("When a complaint alleges a claim based on events occurring after the expiration of a collective bargaining agreement, courts have held that section 301 cannot provide a basis for jurisdiction."). Liberty maintains that it abided by the contract until midnight on September 30 and that the conduct MEBA complains of and seeks to arbitrate in this suit—namely, Liberty's replacing MEBA workers with AMO workers—occurred *after* that time. In Liberty's view, *if* the parties reached impasse before September 30, then (1) the contract expired at midnight; (2) the conduct MEBA seeks to arbitrate occurred after the contract expired; and therefore (3) the court cannot exercise jurisdiction over the "contractual" claim because it did not in fact arise under the parties' contract at all. Thus, Liberty concludes, for the court to determine if it has section 301 jurisdiction, it must necessarily determine whether the parties reached impasse.

resolved the question in Liberty's favor (that is, impasse occurred), then the court would have been obligated to dismiss the case for lack of jurisdiction. Although a court must generally resolve a disputed jurisdictional fact if a so-called factual attack on the court's subject matter jurisdiction is made, *see, e.g.*, *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992), impasse *vel non* is not a jurisdictional fact. Section 301 of the LMRA grants the district court jurisdiction of "[s]uits for violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(a). For a district court to exercise jurisdiction, then, there need not be a valid contract but only a suit for violation of a contract. The existence of the contract is instead an element of the cause of action. *See Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1005–06 (6th Cir. 2009) (section 301's "contract requirement is non-jurisdictional" and instead constitutes "an element of a cause of action"); *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 66*, 580 F.3d 185, 189 (3d Cir. 2009) ("It is unnecessary for us to resolve whether or not the CBAs were terminated [before the alleged breach] because . . . the existence of a contract is not a jurisdictional element of a section 301 claim."). *See generally Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006) (court must determine whether statutory requirement is jurisdictional or instead describes elements of cause of action).

Second, Liberty attempts to argue that even if MEBA's suit is nominally contractual, it is in fact "primarily representational" because MEBA's goal in bringing the suit is to replace AMO as the bargaining representative of the officers and engineers aboard Liberty vessels. According to Liberty, "MEBA's objective in this case is to displace its rival union . . . and establish MEBA's representational rights over the supervisors working aboard Liberty's ships"—action that

violates section 8 of the NLRA and thus triggers the NLRB's jurisdiction. Appellant's Br. at 34.

Liberty relies on the Eighth Circuit's opinion in *Morello v. Federal Barge Lines, Inc.* to support its argument. 746 F.2d 1347. There, two employers had CBAs with one union, which CBAs were set to expire on a date certain provided one party notified the other of its intent to terminate. *Id.* at 1348. The employers provided the required termination notice and the union responded by attempting to begin negotiations. *Id.* The employers ignored the union on the ground that they had no duty to negotiate because the union members were "supervisors" rather than "employees" under the CBAs' terms. *Id.* The union sued, alleging that the employers had breached the CBAs by refusing to negotiate; specifically, it argued that the employers did in fact have a duty to negotiate because the union members were employees, not supervisors. *Id.* at 1348–49. Although the case was not pending before the NLRB, the Eighth Circuit held that the question at the center of the dispute was whether the union members were supervisors or employees—and that question was "one of representation," not contract. *Id.* at 1349. Accordingly, it held that the district court lacked jurisdiction. *Id.* at 1351.

Liberty claims that here, as in *Morello*, the center of the dispute is a representational question—which union, MEBA or AMO, has the right to represent Liberty's supervisors. According to Liberty, the court "cannot reach the central issues in MEBA's complaint and grant relief without coercing Liberty to accept MEBA-represented supervisors." Appellant's Br. at 39. Because such relief involves a "representational issue" and would, according to Liberty, violate the NLRA, Liberty argues that the claim is "primarily representational."

We disagree. Liberty's argument on this point suffers from a fatal flaw: it conflates the type of claim with the effect of a claim's enforcement. *Garmon* preemption is designed to prevent a court from deciding a claim that can only be characterized as representational; to resolve such a claim, a court must decide a representational question. *Morello* is a perfect example. To resolve the dispute, the court would have had to decide whether certain individuals were "employees" or "supervisors" under the NLRA. *Morello*, 746 F.2d at 1349. The court correctly ruled that, even if framed as a "contractual" dispute, that question is one squarely within the NLRB's province. *See id.*

On the other hand, resolving MEBA's suit requires deciding plainly contractual matters—what constitutes "impasse" and whether Liberty's conduct breached the parties' agreement. The decision may ultimately have a representational effect in that MEBA could, under the terms of the contract, be reinstated as the representative of Liberty's officers and engineers. But that effect results from the enforcement of the CBA, not from the resolution of any representational question. Thus, *Morello* offers Liberty little support.

Moreover, MEBA's suit does not fit into the other two categories of "primarily representational" claims recognized by other circuits. The case is not currently pending before the NLRB, *see DiPonio*, 687 F.3d at 750; in fact, the opposite is true. Liberty initially filed an unfair labor practice charge with the NLRB, claiming that MEBA's lawsuit to compel arbitration violated the NLRA, but the NLRB's Office of the General Counsel (OGC) recommended dismissal because it involved a "bona fide contractual issue," *Marine Eng'rs Beneficial Ass'n* (*Liberty Mar.*), Case 05-CB-077851, NLRB Advice Mem. at 6, Aug. 31, 2012; Liberty subsequently

withdrew its charge. In addition, there is no "initial" representational question at issue, *see DiPonio*, 687 F.3d at 750; in fact, no representational question is presented at all. Rather, the dispute boils down to a contractual one—whether the New Agreement remained in effect as of 12:01a.m. on October 1 and whether Liberty violated it. Accordingly, we conclude that the district court properly exercised its jurisdiction under section 301 of the LMRA.

## B. Arbitration

Having concluded that the district court had jurisdiction to compel arbitration generally, we turn to the specific merits inquiry in this case: is *when* the contract expired—*i.e.*, whether the parties reached impasse—an arbitrable issue? The district court answered in the affirmative, *see Liberty Mar.*, 70 F. Supp. 3d at 350, and we agree.

The Supreme Court has set out "the proper framework for deciding when disputes are arbitrable." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010). "Under that framework, a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Id.* (emphasis in original); *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960))).

In considering how to apply this framework, we have used "[a] trichotomy among the disputes that arise in arbitrability cases." *Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 850 F.2d 756, 761 (D.C. Cir. 1988). There are (1) "disputes over the formation of an agreement to arbitrate"; (2) "disputes over

the breadth of an arbitration clause, where the parties disagree over whether a certain issue falls within or without the subject matter coverage of an undoubted agreement to arbitrate"; and (3) disputes that "relate[] to the length, rather than the breadth, of an arbitration clause." *Id.* at 761. In other words, three types of arbitrability disputes typically arise: (1) formation disputes; (2) breadth disputes; and (3) duration disputes.

It is settled that a formation dispute is "generally for courts to decide." *Granite Rock*, 561 U.S. at 296; *Nat'l R.R.*, 850 F.2d at 761 ("[I]f the parties disagree as to whether they ever entered into any arbitration agreement at all, the court must resolve that dispute."). Similarly, a breadth dispute is "generally for the courts to determine" but "parties may agree to arbitrate questions of breadth" so long as they do so plainly. *Nat'l R.R.*, 850 F.2d at 761.

A duration dispute is a different animal. We have articulated a rather detailed set of "general rules" for "resolving disputes . . . over the expiration or termination of an arbitration clause":

> If the arbitration clause is a narrow one, covering only specified types of disputes . . . , then we must presume that the parties did *not* intend for disputes over contract duration to be referred to arbitration. In such a case, the court will decide the question of duration unless the party seeking arbitration makes a clear showing that the contracting parties intended such disputes to be arbitrated. Faced with a somewhat broader arbitration clause, however, such as one providing generally (perhaps with certain specified exceptions) that disputes "arising under" or "concerning" the contract are

> to be arbitrated, we will *presume* that disputes over the termination or expiration of the contract should be submitted to arbitration. Of course, this presumption also attaches where the arbitration clause is broader still, such as one requiring arbitration of "any grievance affecting the mutual relations of the parties."

*Id.* at 762 (citation omitted) (emphases added). The presumption, however, is not absolute.

> [E]ven in cases involving very broad arbitration clauses, the presumption in favor of arbitrating disputes over contract duration can be overcome by a *clear showing* that the parties intended for the underlying contract to expire, or separately agreed to terminate it, before the relevant dispute arose. For example, if a contract provides that "all disputes between the parties shall be arbitrated," but with equal clarity provides that it will expire on a date certain, then any dispute over whether the contract actually expired or was extended by the parties must be decided by the court rather than by the arbitrator.

*Id.* at 762–63 (emphasis added).

Liberty argues that the dispute in this case is more akin to a formation dispute than a duration dispute; accordingly, it asserts that, before compelling arbitration, the court must decide whether the New Agreement was "in existence" at the time MEBA filed its grievances. Appellant's Br. 50. In support of this argument, it relies heavily on the Supreme Court's statement in *Granite Rock* that if "any issue . . . calls into question the formation or applicability of the specific

arbitration clause that a party seeks to have a court enforce," the district court must resolve that issue "[t]o satisfy itself" that the parties did indeed intend to arbitrate. 561 U.S. at 297. According to Liberty, its claim that the New Agreement expired "calls into question the . . . applicability" of the arbitration clause. *See id.*

Liberty also relies on *Granite Rock*'s analogous facts. In that case, a union and an employer were parties to a CBA that expired. *Id.* at 292. When the parties reached impasse in negotiating a new CBA, the union went on strike. *Id.* Negotiations continued and eventually the parties reached agreement on a new CBA that included both an arbitration provision and an anti-strike provision. *Id.* at 292–93. The new CBA did not address the employer's damages arising from the strike and the parties attempted to reach a separate "back-to-work" agreement holding workers harmless as to those damages. *Id.* at 293. They were unsuccessful, the union remained on strike and the employer sued the union for damages for violating the anti-strike provision of the new CBA. *Id.* at 293–94. The parties disputed the new CBA's ratification date. *Id.* at 294–95. The union argued that the ratification issue should be resolved via arbitration. *Id.* at 295. The Supreme Court disagreed, holding that ratification determined the date on which the parties agreed to begin arbitrating disputes. *Id.* at 303–05. The district court, not the arbitrator, was required to decide the question. *Id.* at 304.

Liberty's attempt to analogize its case to *Granite Rock* rings hollow. *Granite Rock* falls squarely within the formation-dispute category of the "trichotomy" we identified in *National Railroad*, 850 F.2d at 761. The issue was when the contract went into effect—a formation issue that, in that case, was central to determining whether the parties had agreed to arbitrate *any* dispute. *Granite Rock*, 561 U.S. at 303–05.

This case has nothing to do with formation. Both parties acknowledge they entered into an enforceable CBA. It thus falls into a different category from *Granite Rock*—it is without doubt a dispute over the agreement's duration. Liberty contends that the New Agreement expired at midnight on September 30, 2011; MEBA contends no impasse was reached and it remained in effect. As a result, *National Railroad* instructs that *who* decides the duration question—the court or an arbitrator—depends upon the *breadth* of the arbitration provision. 850 F.2d at 762–63 ("[W]e believe that the breadth of the arbitration clause does bear on the question of who must determine its length."). If the arbitration provision is broad, the court presumes that the parties intended to arbitrate the duration dispute; and unless a party can overcome the presumption with "a clear showing" that the parties intended the contract to expire, the duration question is reserved to the arbitrator. *Id.* at 763. Conversely, if the arbitration provision is narrow, and thus does not appear to cover duration, the court determines whether the contract remained in effect. *Id.*

Here, the arbitration clause is quite broad: "All disputes relating to the interpretation or performance of this Agreement shall be determined in accordance with the provisions in this [Arbitration-and-Grievance Procedure] Section." Tanker Agreement, at 10. "All disputes relating to the interpretation . . . of this Agreement," *see id.*, includes a dispute as to the interpretation of the duration provision—including the word "impasse." As the district court pointed out, "[e]ven if this Court were to read the instant arbitration clause to suggest that the parties only intended to arbitrate issues of contract interpretation . . . , the question of whether the parties' otherwise valid agreement expired *is* precisely such an issue—it requires interpretation of the agreement's duration provision." *Liberty Mar.*, 70 F. Supp. 3d at 347 (emphasis in original). As the court further noted, the New Agreement's

arbitration clause is similar to the "broad" arbitration clause to which the Supreme Court found the presumption of arbitrability "particularly applicable." *Id.* at 348 (quoting *AT&T Techs.*, 475 U.S. at 650). As a result, unless Liberty can make a "clear showing" that the parties intended the New Agreement to expire, the duration question is for the arbitrator, not the court.

This Liberty fails to do. The duration provision does not with abundant "clarity" provide a fixed expiration date, *see Nat'l R.R.*, 850 F.2d at 763; rather, the September 30, 2011 deadline gives way as soon as one party gives notice of its intent to amend the agreement. At that point, the New Agreement remains in effect until the parties reach "impasse." *See* MOU § 1. Although Liberty has a plausible argument that the parties reached impasse, MEBA has an equally plausible argument that they did not. Because expiration turns on impasse—and Liberty cannot make a clear showing that impasse occurred—the issue is plainly arbitrable under the terms of the CBA.

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*